Catherine **LAKE**

v.

Dr. Dale C. **CAMERON.**

No. 439–62.

United States District Court
District of Columbia.

April 17, 1967.

**156**

Hyman Smollar, Washington, D. C., for petitioner.

Oscar Altshuler, Washington, D. C., Edmund L. Browning, Jr., Asst. Corp. Counsel, Arthur J. McLaughlin, · Washington, D. C., Chairman, Mental Health Commission, for respondent.

## MEMORANDUM

LEONARD P. WALSH, District Judge.

Late in September, 1962, Catherine Lake, patient-petitioner herein, was found by a member of the Metropolitan Police Department while she was wandering in the vicinity of Fifth and E Streets, N. W., and was taken to the Women's Bureau of the Police Department.

On October 3, 1962, civil commitment proceedings were instituted by the filing of a petition by the Police Department. This petition, signed by Detective Maude B. Knight, stated as grounds for the petition that Mrs. Lake " * * * was looking for a place to stay, without funds. She cannot remember last address. * * This woman is incapable of making plans for herself or handling her own affairs, and it is felt that hospitalization is the only solution to her problem." [Mental Health Case No. 2012–62]. This Court, sitting as Motions Judge, signed an Order..on October 3, 1962 granting the petition and ordering that Mrs. Lake be referred to the Mental Health Commission, and that she be detained at D. C. General Hospital for thirty days or until discharged or transferred by order of the Court. A *guardian ad litem* was appointed.

On October 11, 1962, the medical staff of the hospital filed a certificate asserting that Catherine Lake was of unsound mind and should be committed for treatment of her mental condition, diagnosed as chronic brain syndrome associated with arteriosclerosis. She was transferred to St. Elizabeth's Hospital on October 11th.

On October 12th the Commission on Mental Health reported its findings that Mrs. Lake was of unsound mind, suffering from chronic brain syndrome and was uncapable of managing her own affairs and recommending her commitment for treatment; that she was without funds, and should be committed to St. Elizabeth's Hospital. On October 15th, the *guardian ad litem* reported that he concurred in the recommendation of the Commission.

Mrs. Lake appeared in open court before the undersigned on October 26, 1962, and requested a jury trial, and the case was set for trial before a jury on November 21st.

In the meantime, on October 11th, Mrs. Lake filed the instant proceeding, (Habeas Corpus No. 439–62) against the Superintendent and others of the D. C. General Hospital staff. Answers were filed by the respective respondents, all to the effect that the petitioner had been

transferred to the custody of St. Elizabeth's Hospital. Leave to file an amended complaint was granted; the amended complaint was filed, and was dismissed the same day. Thereafter leave to appeal without prepayment of costs was granted.

The trial by jury in Mental Health case No. 2012–62 was held before Judge McGuire, and Mrs. Lake was found of unsound mind, and she was thereafter committed to St. Elizabeth's "until she may be safely discharged therefrom."

The Circuit Court, in Lake v. Cameron, et al., No. 17,531, January 9, 1964, (118 U.S.App.D.C. 25, 331 F.2d 771), reversed and remanded the Habeas Corpus proceeding (H.C. 439–62) for further proceedings, on the grounds that the dismissal was a summary disposition in that the respondent had made no return, no hearing was held, and no findings made.

In accordance with the directive of the Circuit Court, on April 10, 1964, the undersigned ordered that the writ issue, returnable April 24. Charles W. Halleck, Esquire, was appointed to represent petitioner. At the request of Mr. Halleck, the appointment was vacated, and Elliot H. Cole, Esquire, was appointed. Mr. Cole also requested that he be relieved, and Martin J. Kirshal, Esquire, was assigned to represent petitioner. The Government filed its return on behalf of respondents on April 23, 1964.

Hearing was held on May 8, 1964, at which petitioner testified on her own behalf. The Court also heard testimony from the sister and the husband of petitioner, as well as from the medical staff of St. Elizabeth's Hospital. On May 22, 1964, this Court entered its findings to the effect that the evidence showed petitioner was suffering from a mental illness and was in need of care and supervision; there was no member of her family able to give her necessary care and supervision, and the family was without sufficient funds to employ a competent person to do so; and further, that she was a danger to herself in that she had a tendency to wander about the streets and was not competent to care for herself. The Court dismissed the petition without prejudice to the filing of a new petition at a time when the family is able to provide for petitioner's care and custody. Petitioner was again granted leave to appeal without prepayment of costs.

In a *Per Curiam* opinion, Lake v. Cameron, No. 18,809, April 1, 1965, the Circuit Court affirmed the lower Court's findings and dismissal of the petition.

The District of Columbia Hospitalization of the Mentally Ill Act, 78 Stat. 944 (1964), D.C.Code, Supp. IV 1965, Sections 21–351 to 21–366, was amended by the Act of Congress of September 14, 1965, 79 Stat. 750, P.L. 89–183, Section 1, D.C.Code Title 21, Sections 501–591 (Supp. V 1966), which became effective January 1, 1966.

The Circuit Court granted a rehearing *en banc*, and in a five to four opinion, Lake v. Cameron, No. 18,809, decided May 19, 1966, amended September 19, 1966, 364 F.2d 657, 124 U.S.App.D.C. 264, remanded the matter of the Habeas Corpus proceeding to this Court for further proceedings in the light of the new Mentally Ill Act.

The pertinent section of that Act, D.C. Code 21–545(b), provides in part that if the court or jury finds a "person is mentally ill and, because of that illness, is likely to injure himself or other persons if allowed to remain at liberty, the court *may* order his hospitalization for an indeterminate period, *or order any other alternative course of treatment which the court believes will be in the best interests of the person or of the public*." (emphasis added). The provision for "other alternative course of treatment" was not in the 1964 Act, and the Circuit Court remanded the case to this Court "for an inquiry into 'other alternative courses of treatment.'"

The judgment of the Circuit Court was filed in this Court on June 7, 1966, and thereafter counsel for petitioner moved that hearing be held some time after July 31, 1966. This motion was granted, with the understanding that counsel for petitioner, counsel for respondent, and the Chairman of the Com-

mission on Mental Health would assist this Court in securing information and witnesses as to "other alternative courses of treatment."

Hearing on remand was begun on August 31st, and further hearings held on September 1st and October 5th, and the matter was taken under advisement. Counsel were instructed to prepare proposed findings of fact and conclusions of law upon completion of the reporter's transcript. Respondent's findings were submitted on December 19, 1966 and those of petitioner on January 23, 1967.

The Circuit Court's opinion suggested that this Court seek aid from 1) the District of Columbia Department of Public Health, 2) the District of Columbia Department of Public Welfare, 3) the Metropolitan Police Department, 4) the District of Columbia Department of Vocational Rehabilitation, 5) the District of Columbia Association for Mental Health, and 6) the Commission on Mental Health. It was also suggested that this Court consider 1) having the petitioner carry on her person an identification card; 2) the acceptance of Public Health Nursing care; 3) the acceptance of day care services; 4) foster home care; 5) home health aid services, and 6) welfare payments for adequate private care.

██ The perplexing problems created by this case result from the above quoted portion of D.C.Code Section 21-545(b) (Supp. V 1966), which provides that the court *may* order hospitalization, or order any other alternative course of treatment.[1]

The statute places upon the District Court the burden of exploring alternatives that are in the best interest of the "person or the public." Such an exploration must necessarily be limited to alternatives designed to implement and satisfy the requisite course of prescribed treatment for the particular patient.

The medical testimony throughout the chronology of this case has remained constant. Mrs. Lake is suffering from chronic brain syndrome associated with arteriosclerosis, with psychotic reaction, and there has been no essential change in her condition or that diagnosis.[2] As a result of this condition, the petitioner receives medication so as to reduce her generally confused state, and she has been placed in a closed ward.

The purpose of her confinement in a closed ward is to prevent her from wandering. Her medical background indicates that she has a strong propensity, when in a confused and disoriented state, to wander aimlessly through the streets until eventually picked up. The records of the Metropolitan Police Department Women's Bureau, and the records of St. Elizabeth's Hospital, indicate that during these periods she has been accosted but has no specific recollection of the events which took place.[3] She had wandered away from the Hospital on two separate occasions before her doctor became aware of "her pronounced tendency to wander."[4] In order to prevent Mrs. Lake from wandering she must be maintained in a closed ward and under "constant supervision."[5]

This Court finds from the testimony that it is quite clear that constant supervision is not only proper but required for the safety of this patient.

The requirement of constant supervision necessarily restricts the availability of other alternative courses of treatment. It means that if the patient is placed in a facility other than St. Elizabeth's, the new facility must provide supervision commensurate with what Mrs. Lake is presently receiving. This reality precludes this Court from ordering the petitioner to wear an identifica-

1. By use of the word "may" the statute has expressly made the duty to investigate discretionary and not mandatory.

2. Transcript, Vol. 1, p. 58, testimony of Dr. Friedman.

3. *Ibid*, page 91, testimony of Captain Catherine Boyd.

4. Ibid, page 107, testimony of Dr. Cameron, Superintendent of St. Elizabeth's Hospital.

5. Ibid, p. 83.

tion, from ordering her to accept community mental health and day care services, from ordering her to accept various family service agency services, or neighborhood supervision, or part-time supervision from social workers in petitioner's neighborhood.

The requirement of constant supervision dictates similar treatment and consequently chanelled the major portion of this investigation into the location of other appropriate facilities.

Mrs. Jessica Epstone of St. Elizabeth's Hospital testified that the Hospital is continually attempting to place its patients in facilities other than the Hospital. Her particular work involves assistance in developing community foster homes for the placement of patients.[6] She has made a specific study of facilities which might be available to Mrs. Lake, based on the treatment required by the doctors, and has found none other than the Hospital. She has excluded the Hospital's foster homes "because of her (Mrs. Lake's) tendency to wander."[7] Mrs. Epstone also testified there are available insufficient funds from public welfare or public health to place Mrs. Lake in a private nursing home where she might get supervision comparable to that she is receiving at St. Elizabeth's.

Dr. Arthur H. Kirocofe, Chief of the Bureau of Centralized Psychiatric Services for the Health Department, testified that the "Health Department has no facility to adequately handle the situation in which she (Mrs. Lake) finds herself now."[8] Although his agency is developing a community mental health concept program, it is not presently in a posture where it can treat patients such as Mrs. Lake.

Mr. David B. Schwartz, the Administrator of D. C. Village, testified that his facility is not an appropriate one for the petitioner. Concerning patients who are transferred from St. Elizabeth's to D. C. Village, he stated: "This is a longstanding program that has been in effect for some time. If I am not mistaken, between eight and ten years. People are referred from St. Elizabeth's if they are able to manage independently. If they need the kind of services that we can provide, or, and if they will stay at D. C. Village as an institution without any either capacity or desire to hold people there. We cannot confine them to D. C. Village. I think the other question about D. C. Village itself is that people are free to wander, and unless they can identify where it is they stay, unless they cannot wander off, our resources are such that we do not accept them from St. Elizabeth's."[9]

Mrs. Roberta Brown, Special Assistant to the Director of Public Welfare in the District of Columbia, Services for the Aging, testified that there were patients with conditions diagnosed similar to that of Catherine Lake in nursing homes and in foster homes, with public assistance bearing the cost.[10] However, Mrs. Brown's remarks were made categorically, and with no particular reference to the needs of petitioner. Mrs. Epstone testified that with the type of care required here, public assistance was inadequate to allow for placing petitioner in a nursing home or foster home.

Since the Court finds that the actual medical and psychiatric treatment extended to Catherine Lake is fully warranted, there is no facility within the District of Columbia, other than St. Elizabeth's, presently capable of treating the petitioner.

As Dr. Cameron pointed out in his reply to a question propounded by Mr. Browning, even if there were not the financial barrier, Mrs. Lake would have to be restrained of her liberty as she is at St. Elizabeth's.[11]

6. Ibid, page 29.
7. Ibid, page 36.
8. Ibid, page 177, testimony of Dr. Kiracofe.
9. Transcript, Vol. II, p. 314, testimony of Daniel B. Schwartz.
10. Transcript, Vol. I, p. 149, testimony of Mrs. Roberta Brown.
11. Ibid, p. 124, testimony of Dr. Cameron.

Footnote 8 of the majority opinion of the Court of Appeals indicates that economic dependency or indigency, as is present here, should be no reason for sending patients to mental hospitals. The note points out that inquiries such as this "will not only reveal the facilities available but will uncover the need for those that are not available." While this inquiry has shown the need, it has not shown the availability. The pathos of economic deprivation cannot detour well reasoned obligations of the Court.

Title 21, Section 545(b) D.C.Code, (Supp. V 1966) and The Court of Appeals majority opinion leave unanswered the two most difficult questions before this trial Court. As this Court remarked in its preliminary statement to this investigation,[12] it has always, prior to the enactment of the new statute, considered alternative facilities for mental health patients. That inquiry was and is made with the aid of the Mental Health Commission and the social service agency at St. Elizabeth's. While the opinion of the majority speaks mainly in terms of facilities, the statute speaks in terms of treatment. To be sure, the facility may be an element of treatment, but the facility as an entity itself, does not appear approachable under the statute.

A second problem is the Court's actual commitment power. The statute says the Court may "order any other alternative course of treatment". This raises the question of whether or not the Court may legally commit a patient to a facility or institution, other than St. Elizabeth's. If the statute does clothe the District Court with authority to order the patient into a private nursing home or to a foster home, the question arises as to whom may the Court look as a responsible party.

At present, when a patient is committed to St. Elizabeth's, and transferred by the Hospital to a foster home, the hospital is the responsible party. Their officials check on both the conditions in the foster home and the patient's adapt-ability to that environment. If the patient is unable to get along satisfactorily, he is returned to the Hospital.

If the Court were to order a patient directly to a foster home or a private nursing home, who would replace St. Elizabeth's as the responsible party? It may be that the Court has the authority to order the patient into another facility and still place the responsibility on St. Elizabeth's, but this point is not clear.

These unanswered questions need resolutions before effective commitments for "alternate course of treatment" can become practical.

The Court would like to make it clear that the problems of 1) distinguishing between facility and treatment, 2) the scope of the Court's "order" authority under the new Act, and 3) the burden of responsibility to the patient and to the Court, had no bearing on this particular case. There is no question that Mrs. Lake requires 24-hour supervision for her own safety, and that the only facility within the District of Columbia available to her which affords that type of treatment is St. Elizabeth's Hospital.

Counsel for respondent to prepare an appropriate order.