Catherine LAKE, Appellant,

v.

Dale C. CAMERON, Superintendent, Saint
Elizabeths Hospital, Appellee.

No. 18809.

United States Court of Appeals
District of Columbia Circuit.

Argued Jan. 19, 1966.

Decided May 19, 1966.

As Amended Sept. 19, 1966.

Burger, Danaher, Tamm, and Mc-
Gowan, Circuit Judges, dissented.

Mr. Hyman Smollar, Washington, D. C. (appointed by this court), with whom Mr. Lawrence S. Schaffner, Washington, D. C., was on the brief, for appellant.

Mr. John A. Terry, Asst. U. S. Atty., with whom Messrs. David G. Bress, U. S. Atty., and Frank Q. Nebeker, Asst. U. S. Atty., were on the brief, for appellee. Mr. Oscar Altshuler, Asst. U. S. Atty., also entered an appearance for appellee.

On Rehearing en banc

Before BAZELON, Chief Judge, EDGERTON,* Senior Circuit Judge, and FAHY, DANAHER, BURGER, WRIGHT, McGOWAN, TAMM and LEVENTHAL, Circuit Judges, sitting en banc.

BAZELON, Chief Judge:

Appellant is confined in Saint Elizabeths Hospital as an insane person and appeals from denial of release in habeas corpus. On September 29, 1962, when she was sixty years old, a policeman found her wandering about and took her to the D.C. General Hospital.[1] On October 11, 1962, she filed in the District Court a petition for a writ of habeas corpus. The court transferred her to St. Elizabeths Hospital for observation in connection with pending commitment proceedings, allowed her to amend her petition by naming the Superintendent of Saint Elizabeths as defendant, and on November 2, 1962, dismissed her petition without holding a hearing or requiring a return.

After she filed her appeal from denial of habeas corpus, she was adjudged "of unsound mind" and committed to Saint Elizabeths. At the commitment hearing two psychiatrists testified that she was mentally ill and one of them that she was suffering from a "chronic brain syndrome" associated with aging and "demonstrated very frequently difficulty with her memory * * *. Occasionally, she was unable to tell me where she was or what the date was." Both psychiatrists testified to the effect that she could not care for herself adequately. She did not take a timely appeal from the commitment order. We heard her appeal from the summary dismissal of her petition for habeas corpus and remanded the case to the District Court with directions to require a return and hold a hearing.[2]

At the hearing on remand, the sole psychiatric witness testified that appellant was suffering from a senile brain disease, "chronic brain syndrome, with arteriosclerosis with reaction." The psychiatrist said she was not dangerous to others and would not intentionally harm herself, but was prone to "wandering away and being out exposed at night or any time that she is out." This witness also related that on one occasion she wandered away from the Hospital, was missing for about thirty-two hours, and was brought back after midnight by a police officer who found her wandering in the streets.

---

* Sitting by authority of 28 U.S.C. § 46, as amended Nov. 13, 1963.

1. D.C.Code § 21–326 (1961), 33 Stat. 316.

2. Lake v. Cameron, 118 U.S.App.D.C. 25, 331 F.2d 771 (1964). This court treated the petition as attacking appellant's post-commitment confinement in St. Elizabeths. The District Court on remand and the parties properly proceeded on this basis since the detention from which appellant sought release continues.

She had suffered a minor injury which she attributed to being chased by boys. She thought she had been away only a few hours and could not tell where she had been. The psychiatrist also testified that she was "confused and agitated" when first admitted to the Hospital but became "comfortable" after "treatment and medication."

At both the commitment hearing and the habeas corpus hearing on remand, appellant testified that she felt able to be at liberty. At the habeas corpus hearing her husband, who had recently reappeared after a long absence, and her sister said they were eager for her release and would try to provide a home for her. The District Court found that she "is suffering from a mental illness with the diagnosis of chronic brain syndrome associated with cerebral arteriosclerosis"; that she "is in need of care and supervision, and that there is no member of the family able to give the petitioner the necessary care and supervision; and that the family is without sufficient funds to employ a competent person to do so"; that she "is a danger to herself in that she has a tendency to wander about the streets, and is not competent to care for herself." The District Court again denied relief in habeas corpus, but noted appellant's right "to make further application in the event that the patient is in a position to show that there would be some facilities available for her provision." The court thus recognized that she might be entitled to release from Saint Elizabeths if other facilities were available, but required her to carry the burden of showing their availability.

Appellant contends in written and oral argument that remand to the District Court is required for a consideration of suitable alternatives to confinement in Saint Elizabeths Hospital in light of the new District of Columbia Hospitalization of the Mentally Ill Act,[3] which came into effect after the hearing in the District Court. Indeed, her counsel appointed by this court, who had interviewed appellant, made clear in answer to a question from the bench on oral argument that although appellant's formal pro se pleading requests outright release, her real complaint is total confinement in a mental institution; that she would rather be in another institution or hospital, if available, or at home, even though under some form of restraint.

■■ Habeas corpus challenges not only the fact of confinement but also the place of confinement.[4] And the court is required to "dispose of the matter as law and justice require." 28 U.S.C. § 2243. The court is not restricted to the alternative of returning appellant to Saint Elizabeths or unconditionally releasing her.

■■ We are not called upon to consider what action we would have taken in the absence of the new Act, because we think the interest of justice and furtherance of the congressional objective require the application to the pending proceeding of the principles adopted in that Act. It provides that if the court or jury finds that a "person is mentally ill and, because of that illness, is likely to injure himself or other persons if allowed to remain at liberty, the court may order his hospitalization for an indeterminate period, or order any other alternative course of treatment which the court believes will be in the best interests of the person or of the public." D.C.Code § 21–545(b) (Supp. V, 1966). This confirms the view of the Department of Health, Education and Welfare that "the entire spectrum of services should be made available, including outpatient treatment, foster care, halfway houses, day hospitals, nursing

---

3. D.C.Code §§ 21–501 to 21–591 (Supp. V, 1966).

4. See Bolden v. Clemmer, 111 U.S.App.D.C. 392, 298 F.2d 306 (1961); Benton v. Reid, 98 U.S.App.D.C. 27, 231 F.2d 780 (1956); Miller v. Overholser, 92 U.S.App. D.C. 110, 206 F.2d 415 (1953).

homes, etc." [5] The alternative course of treatment or care should be fashioned as the interests of the person and of the public require in the particular case.[6] Deprivations of liberty solely because of dangers to the ill persons themselves should not go beyond what is necessary for their protection.[7]

The court's duty to explore alternatives in such a case as this is related also to the obligation of the state to bear the burden of exploration of possible alternatives an indigent cannot bear. This appellant, as appears from the record, would not be confined in Saint Elizabeths if her family were able to care for her or pay for the care she needs. Though she cannot be given such care as only the wealthy can afford, an earnest effort should be made to review and exhaust available resources of the community in order to provide care reasonably suited to her needs.[8]

At the habeas corpus hearing, the psychiatrist testified that appellant did not need "constant medical supervision," but only "attention"; that the psychiatrist would have no objection if appellant "were in a nursing home, or a place where there would be supervision." At the commitment hearing one psychiatrist testified that "Mrs. Lake needs care, whether it be in the hospital or out of the hospital," and did not specify what, if any, *psychiatric* care she needs. The second psychiatrist testified that she "needs close watching. She could wander off. She could get hurt and she certainly needs someone to see that her body is adequately cared for * * *. [She] needs care and kindness * * *."[9] It does not

5. S.Rep. No. 925, 88th Cong., 2d Sess., 31 (1964). The Committee said: "The original bill did not provide for court order of any course of treatment besides indeterminate hospitalization. This provision was included to cover those cases where such treatment as placement in halfway houses or outpatient care may be indicated." S.Rep. No. 925 at 19.

Compare California Welfare and Institutions Code § 5568, which grants broad discretion in selecting treatment alternatives:

If * * * the court finds a person to be mentally disordered and bordering on mental illness but not dangerously mentally ill, the court may commit him to the care and custody of the counselor in mental health and may allow him to remain in his home subject to the visitation of a counselor in mental health and subject to return to the court for further proceedings whenever such action appears necessary or desirable; or the court may commit him to be placed in a suitable home, sanitarium or rest haven home, subject to the supervision of the counselor in mental health and the further order of the court.

6. The District of Columbia Department of Public Health, in its COMPREHENSIVE MENTAL HEALTH SERVICES IN THE DISTRICT OF COLUMBIA, 82, says of the 1964 Act:

"This certainly provides the necessary flexibility to commit a patient to less than 24-hour care; for example, to an outpatient program, a Halfway House, etc. It also makes it possible for the court to send a senile patient to a non-psychiatric chronic disease facility at St. Elizabeths or elsewhere. In short, the machinery of the court can be used to obtain compulsory attendance at any variant of treatment, provided * * * [the standards of the Act apply]."

7. See Guttmacher & Weihofen, PSYCHIATRY AND THE LAW 311–12 (1952); Brenner, *Denial of Due Process and Civil Rights Under Sections 73 and 73a of the Mental Hygiene Law to Aged Seniles without Major Mental Impairment*, 34 N.Y.ST.B.J. 19, 20 (1962).

8. "Economic dependency should not be a reason for sending physically ill and socially dependent oldsters to state mental hospitals. Financial arrangements should be made to give them physical, nursing, and domiciliary care in their own communities." Statement of the National Association of State Mental Health Program Directors before the Joint Subcommittee on Long-Term Care of the Special Senate Committee on Aging, 88th Cong., 2d Sess., pt. 3 at 287. The inquiry into alternatives will not only reveal the facilities available but will uncover the need for those that are not available.

9. Dr. Dale C. Cameron, Superintendent of Saint Elizabeths Hospital, has said that "only 50% of the patients * * * hospitalized required hospitalization in a mental institution" and "for many older patients, the primary need was found to be for physical rather than psychiatric care." Hearings Before the Subcommit-

appear from this testimony that appellant's illness required the complete deprivation of liberty that results from commitment to Saint Elizabeths as a person of "unsound mind."

■■ Appellant may not be required to carry the burden of showing the availability of alternatives. Proceedings involving the care and treatment of the mentally ill are not strictly adversary proceedings.[10] Moreover, appellant plainly does not know and lacks the means to ascertain what alternatives, if any, are available, but the government knows or has the means of knowing and should therefore assist the court in acquiring such information.

■■ We remand the case to the District Court for an inquiry into "other alternative courses of treatment." The court may consider, e. g., whether the appellant and the public would be suffi-

ciently protected if she were required to carry an identification card on her person so that the police or others could take her home if she should wander,[11] or whether she should be required to accept public health nursing care, community mental health and day care services, foster care,[12] home health aide services, or whether available welfare payments might finance adequate private care.[13] Every effort should be made to find a course of treatment which appellant might be willing to accept.[14]

■ In making this inquiry, the District Court may seek aid from various sources, for example the D.C. Department of Public Health, the D.C. Department of Public Welfare, the Metropolitan Police Department, the D.C. Department of Vocational Rehabilitation, the D.C. Association for Mental Health, the various family service agencies, social workers from

---

tee on St. Elizabeths Hospital of the House Committee on Education and Labor, 88th Cong., 1st Sess. 23–4 (1963). At the hearing before the Joint Subcommittee on Long-Term Care of the Special Senate Committee on Aging, *supra* note 8, the National Association of State Mental Health Program Directors commented on the elderly who

"are forgetful, mildly confused, and need various degrees of nursing care or domiciliary care which should be provided in approved nursing homes or private care homes. They should not be required to live in state mental hospitals in 60 to 100 bed wards with gang bathrooms, and loss of all individuality and personal dignity, even though this type of 'human warehousing' is cheaper than care in nursing homes.

"Any infirm person, but especially the aged infirm, should be kept as near to home as possible, where family, friends and familiar surroundings offer the best possible link with his usual life."

See also GAP COMMITTEE ON AGING, PSYCHIATRY AND THE AGED, AN INTRODUCTORY APPROACH 544 (1965).

10. See Dooling v. Overholser, 100 U.S.App. D.C. 247, 250, 243 F.2d 825, 828 (1957); DeMarcos v. Overholser, 78 U.S.App.D.C. 131, 137 F.2d 698, cert. denied, 320 U.S. 785, 64 S.Ct. 157, 88 L.Ed. 472 (1943); Overholser v. Treibly, 79 U.S.App.D.C. 389, 392, 147 F.2d 705, 708, cert. denied,

326 U.S. 730, 66 S.Ct. 38, 90 L.Ed. 434 (1945). The commitment judge in the present case rightly said: "This is not strictly an adversary proceeding and, as a consequence, there is no argument made to the jury * * *. [This proceeding] makes absolutely certain that no one will be 'railroaded' * * *."

11. "Care may range from as little as help for a few hours once a week with heavy chores to full bed care. Supervision may range from as little as an informal call by a neighbor once a day to the complete supervision of a mental hospital." THE NATIONAL COUNCIL ON AGING, GUARDIANSHIP AND PROTECTIVE SERVICES FOR OLDER PEOPLE 2 (1963).

12. See U. S. DEPARTMENT OF HEALTH, EDUCATION AND WELFARE, FOSTER FAMILY CARE FOR THE AGED (1965).

13. See U. S. PRESIDENT'S COUNCIL ON AGING, FEDERAL PAYMENTS TO OLDER PERSONS IN NEED OF PROTECTION (1965).

14. "Care and services should be provided in such a way as to be most satisfying to the person concerned. This will usually, although not necessarily, imply keeping the person in his own home if possible; otherwise arranging for his care in surroundings which take into consideration not only his physical and mental health but also his usual and preferred mode of life." THE NATIONAL COUNCIL ON THE AGING, *supra* note 11, at 5.

the patient's neighborhood, and neighbors who might be able to provide supervision.[15] The court can also require the aid of the Commission on Mental Health, which was established "in recognition of the fact that the assistance of unbiased experts was essential to assist courts in dealing with insanity cases."[16] The Commission's aid is available in habeas corpus proceedings as well as commitment proceedings.[17] The Commission, like the court, may obtain the aid of appropriate groups and individuals.[18]

We express no opinion on questions that would arise if on remand the court should find no available alternative to confinement in Saint Elizabeths.[19]

We respectfully reject the suggestion that our opinion may be read as amounting to a revival of all commitments that had already become final. This case has its special features within which the opinion is confined. This appears from the factual setting of the opinion. The District Court recognized the problem in suggesting that if this patient could show that there were other facilities available for her provision she could apply again to the court. Our decision does no more than require the exploration respecting other facilities to be made by the government for the indigent appellant in the circumstances of this case.

Habeas corpus proceedings always have been available to test the validity of a deprivation of liberty—see, e. g., Stewart v. Overholser, 87 U.S.App. D.C. 402, 186 F.2d 339 (1950) ; and where there has occurred, as here, a change in the applicable statutory law pending the appeal, remand for consideration by the trial court under the intervening statute is appropriate if not required. To require in a habeas corpus proceeding that the court consider an intervening statute applicable to the situation is not to require a new commitment proceeding, nor does it open one already concluded.

Remanded for further proceedings in accordance with this opinion.

J. SKELLY WRIGHT, Circuit Judge (concurring) :

I concur in the court's opinion, but wish to make clear my position that, while the District of Columbia may be able to make some provision for Mrs. Lake's safety under our statute, the permissible alternatives, on the record before us, do not include full-time involuntary confinement. The record shows only that Mrs. Lake is somewhat senile; that she has a poor memory, has wandered on a few occasions, and is unable to care for herself at all times. This evidence makes out a need for custodial care of some sort, but I can-

---

15. See HEALTH AND WELFARE COUNCIL OF THE NATIONAL CAPITAL AREA, WHERE TO TURN FOR HEALTH, WELFARE AND RECREATION SERVICES (1965) ; D. C. DEPARTMENT OF PUBLIC HEALTH, COMPREHENSIVE MENTAL HEALTH SERVICES IN THE DISTRICT OF COLUMBIA 47–69 (1965).

16. DeMarcos v. Overholser, 78 U.S.App. D.C. 131, 132, 137 F.2d 698, 699, cert. denied, 320 U.S. 785, 64 S.Ct. 157 (1943).

17. DeMarcos v. Overholser, supra note 16; Overholser v. Boddie, 87 U.S.App. D.C. 186, 189, 184 F.2d 240, 243, 21 A.L.R.2d 999 (1950).

18. In the initial statutory proceedings, the Commission is required to "hear testimony of any person whose testimony may be relevant and * * * receive all relevant evidence which may be offered."

D.C.Code § 21–542 (Supp. V, 1966). Before the statutory commitment proceedings in the District Court, the Commission is required to report to the court its "findings of fact, conclusions of law, and recommendations." D.C.Code § 21–544 (Supp. V, 1966). This contemplates that the Commission will report the alternatives it has considered and the reasons for its recommendation. If the Commission's inquiry is inadequate, the court may require that it be supplemented. The court may subpoena witnesses to appear before the Commission. DeMarcos v. Overholser, supra note 16.

19. Such questions might be whether so complete a deprivation of appellant's liberty basically because of her poverty could be reconciled with due process of law and the equal protection of the laws.

not accept the proposition that this showing automatically entitles the Government to compel Mrs. Lake to accept its help at the price of her freedom.

BURGER, Circuit Judge, with whom DANAHER and TAMM, Circuit Judges, join (dissenting).

We disagree with remanding the case to require the District Court to carry out an investigation of alternatives for which Appellant has never indicated any desire. The only issue before us is the legality of Mrs. Lake's confinement in Saint Elizabeths Hospital and the only relief she herself has requested is immediate unconditional release.[1] The majority does not intimate that Appellant's present confinement as a patient at Saint Elizabeths Hospital is illegal,[2] or that there is anything wrong with it except that she does not like it and wishes to get out of any confinement. Nevertheless, this Court now orders the District Court to perform functions normally reserved to social agencies by commanding search for a judicially approved course of treatment or custodial care for this mentally ill person who is plainly unable to care for herself. Neither this Court nor the District Court is equipped to carry out the broad geriatric inquiry proposed or to resolve the social and economic issues involved. This is particularly illustrated in the first alternative the majority commands the District Court to explore:

> whether the appellant and the public would be sufficiently protected if she were required to carry an identification card on her person so that the police or others could take her home if she should wander * * *.

The list of subjects to explore concludes with an admonition that "every effort should be made to find a course of treatment which appellant might be willing to accept."

Although proceedings for commitment of mentally ill persons are not strictly adversary, a United States court in our legal system is not set up to initiate inquiries and direct studies of social welfare facilities or other social problems. This Court exists to decide questions put before it by parties to litigation on the basis of issues raised by them in pleadings and facts adduced by those parties. D.C.CODE § 21–545 (Supp.1966) does not transmute the United States District Court for the District of Columbia into an administrative agency for proceedings involving the mentally ill. This statute provides only that "the court may order [a mentally ill person's] * * * hospitalization for an indeterminate period, or order any other alternative course of treatment which *the court believes* will be in the best interests of the person or of the public." (Emphasis added.) All this section does, or was intended to do, is authorize the court to order alternative courses of treatment, provided the evidence presented to it leads it to believe that some alternative is preferable to confinement in Saint Elizabeths Hospital. This appellant seeks only her release, not a transfer. We cannot find anything in this statute which even vaguely hints at a requirement that the court conduct broad inquiries into possible treatment facilities. In the absence of such language, we must interpret the statute as not enlarging the role of the court beyond its normal judicial function of deciding issues presented by the parties on the basis of such facts as the parties present.

Even if the statute were read to require the District Court or the Mental Health Commission to investigate alternatives during the commitment proceedings, clearly a petitioner in a habeas corpus proceeding bears the initial burden of establishing the illegality of the present confinement. If, in order to accomplish this end, it is relevant to show that there are preferable alternatives to confinement in Saint Elizabeths, then the

---

1. The question of alternative treatment was never raised until this court requested counsel to discuss it in their briefs and arguments on rehearing *en banc*.

2. Undisputed medical testimony was that Appellant "surely could not take care of herself in the community; * * * she needs supervision."

burden is on the petitioner to show the existence of these alternatives. Yet, from the filing of Mrs. Lake's petition to the present moment, no one including the majority of this Court has demonstrated any alternative "course of treatment."

What the majority has done here is first rewrite Mrs. Lake's petition for her, to demand something which she has never requested, then it has proceeded to remand, ordering the District Court to consider this new "petition" written by this court. Mrs. Lake and her successive lawyers have never asked for exploration of alternatives; she requested total release. The majority orders the District Court to make "every effort * * * to find a course of treatment which appellant might be willing to accept" yet at the same time the majority flouts the petitioner's wishes. What she wants this Court to do is to decide the legality of her commitment; however, the majority explicitly reserves that question pending the results of the study of District of Columbia social welfare facilities which it has ordered the Trial Court to undertake. We believe that this court should decide the issues raised by Appellant, not the issues it feels the Appellant should have raised. The Court's failure to decide the issues raised leaves her confined in St. Elizabeths Hospital while the District Court conducts a study largely unrelated to the question of the legality of that confinement, and for which a court is not equipped.

To show that Appellant really does object to the *place* of her confinement, the majority is forced to rely on the response of her appointed counsel to a question from the bench at oral argument. Counsel said that Appellant's major objection was that she was confined in a mental institution, and he intimated that possibly she might not be so unhappy with confinement in some other institution. This indicates that a large part of what troubles both Appellant and the majority is the fact that she is being confined in a *mental* institution and not some type of home for the aged which would provide essentially the same care but would not have attached to it the "onus" of being associated with a mental institution.

If Appellant were to receive precisely the same care she is presently receiving in the geriatrics ward of St. Elizabeths at an institution elsewhere with a name like Columbia Rest Haven, it does not appear that there would be much disagreement over the propriety of her confinement. However, a person's freedom is no less arrested, nor is the effect on him significantly different, if he is confined in a rest home with a euphemistic name rather than at St. Elizabeths Hospital. The cases the majority cites to support the proposition that habeas corpus is available to challenge the place of custody all involved the quite different situation of challenges based on the nature rather than simply the name of the place of custody. Any conceivable relevance of those cases to the contentions made in the present case is eliminated by the fact that no one denies that Appellant is mentally ill.

We can all agree in principle that a series of graded institutions with various kinds of homes for the aged and infirm would be a happier solution to the problem than confining harmless senile ladies in St. Elizabeths Hospital with approximately 8000 patients, maintained at a great public expense. But it would be a piece of unmitigated folly to turn this appellant loose on the streets with or without an identity tag; and I am sure for my part that no District Judge will order such a solution. This city is hardly a safe place for able-bodied men, to say nothing of an infirm, senile, and disoriented woman to wander about with no protection except an identity tag advising police where to take her. The record shows that in her past wanderings she has been molested, and should she be allowed to wander again all of her problems might well be rendered moot either by natural causes or violence.

McGOWAN, Circuit Judge (dissenting):

I dissent for the reason that, with all respect, I am unable to understand just

what the majority's concept of finality is in civil commitment proceedings for the mentally ill.

As for the instant case, appellant sought only her outright release on habeas corpus. Represented by counsel, she endeavored to show by evidence that her condition did not require further custody of any kind, and that, in any event, her husband and other relatives could furnish such care and supervision as might be required. The District Court found the facts to be otherwise on both of these approaches, and no one suggests that those findings are erroneous. That ordinarily would end the matter, subject always to the right of appellant to seek hereafter a different disposition of her person, either on habeas corpus or under the specific provisions of the new law referred to hereinafter.

Appellant's original commitment in mental health proceedings was under a statute which, effective September 15, 1964, was replaced by a new one, which is now codified as 21 D.C.Code §§ 501–591 (Supp. V, 1966). The majority opinion may perhaps mean that all those originally committed under the old law may, by means of habeas corpus, have a new original commitment hearing under the terms of the new statute. This would presumably be for the purpose of giving everyone a chance to have the committing tribunal consider "any other alternative course of treatment which the court believes will be in the best interests of the person or of the public." [1] 21 D.C.Code § 545. Under this approach, all commitment proceedings which became final before the new statute are now open for a

*de novo* inquiry, with the party seeking the commitment cast in the usual role of moving party. But, if the majority opinion be regarded as accomplishing this much, it is by no means clear that the replay on habeas corpus is limited only to those finally committed before the new law became effective.

I am by no means persuaded that Congress, by the enactment of the new statute, intended either of these consequences. The new law, indeed, contains its own provisions for periodic review of commitments made either under it or the old law, 21 D.C.Code §§ 546, 589; and those provisions are hardly to be identified with what is prescribed on the remand which the court orders. And it may well come as a surprise to Congress to know that the new mental hospitalization act is fully retrospective in operation to the point of reopening all commitments which had become final earlier. It may have thought, contrarily, that such complete retroactivity was not necessary in view of the traditional availability of habeas corpus under which any person under commitment, aided by counsel either retained or provided, may come into court and show that the particular relief sought is justified. In any event, it seems likely that it was this kind of habeas corpus which Congress expressly preserved in the new law, 21 D.C.Code § 549, for the benefit of all persons originally committed under either the new or the old law.

Judges DANAHER, BURGER, and TAMM have authorized me to say that they concur in this opinion.

---

1. Just how much of a change in substance there is between the new law and the old in this respect is problematical. The corresponding language of the latter, 21 D.C. Code § 315 (1961 ed.), is as follows:

   If the judge be satisfied that the alleged insane person is insane, or if a jury shall so find, the judge may commit the insane person *as he in his discretion shall find to be for the best interests of the public and of the insane person.* (Emphasis added.)