**In re Greta SMITH, Appellant**

**No. 03–FM–501.**

District of Columbia Court of Appeals.

Argued Oct. 14, 2004.

Decided Aug. 11, 2005.

---

Lois R. Goodman, appointed by the court, for appellant.

Stacy L. Anderson, Assistant Attorney General for the District of Columbia, with whom Robert J. Spagnoletti, Attorney General, and Edward E. Schwab, Deputy Attorney General, were on the brief, for appellee District of Columbia.

Before TERRY and RUIZ, Associate Judges, and KING, Senior Judge.

TERRY, Associate Judge:

This is an appeal from an order of the Superior Court, entered in May 2003, revoking appellant's outpatient status and committing her indefinitely for inpatient treatment to the District of Columbia Commission on Mental Health Services ("MHS"). While appellant is now committed pursuant to a subsequent order, she contends that the trial court's revocation of her outpatient status in the original order was wrongful and should be vacated. Consequently, she is not requesting release but instead seeks a ruling that her commitment based on the May 2003 order was unlawful. We conclude that intervening events since the entry of the May 2003 order have made this appeal moot.

I

On January 10, 1989, the trial court committed appellant Greta Smith to the care of MHS after finding her to be mentally incompetent and "unlikely to regain competency in the reasonably foreseeable

future" to stand trial on a pending criminal charge of distributing cocaine. On April 26, 1989, the court held a final hearing on MHS's petition that Ms. Smith continue to be hospitalized for treatment. MHS maintained that, if released, she would not continue her psychiatric treatment, and thus would become a "danger to herself and . . . would place herself in dangerous situations." The court found that Ms. Smith was "mentally ill and . . . likely to injure herself or others if allowed to remain at liberty" and ordered her indefinitely committed to the custody of MHS for inpatient treatment.

Between 1989 and 1999, Ms. Smith escaped twice from Saint Elizabeths Hospital. Then, on April 22, 1999, Saint Elizabeths terminated Ms. Smith's inpatient treatment and released her to Community Connections, an outpatient clinic specializing in intensive case management. A letter from Community Connections, dated March 8, 2000, outlined Ms. Smith's subsequent failure to comply with her treatment plan, including several instances of drug abuse, refusing treatment, sexual solicitation, and violating curfew. In addition, Ms. Smith had ceased to report to Community Connections for scheduled outpatient treatment sessions. On March 10, after a psychiatric examination, the trial court found probable cause to believe that Ms. Smith had failed to abide by her treatment regimen and that her mental condition had

deteriorated. The court issued an order authorizing Ms. Smith's involuntary return to the Comprehensive Psychiatric Emergency Program at MHS. She was returned to Saint Elizabeths by the United States Marshals Service on March 17 and was transferred to Community Connections for outpatient care on March 30, 2000.

Between April 2000 and October 2002, Ms. Smith moved in and out of Saint Elizabeths, but when she was away from the hospital, she failed to comply with her treatment plan.[1] She was again involuntarily rehospitalized on October 11, 2002, after threatening some people in a laundromat with a bottle. Further psychiatric examinations revealed that Ms. Smith had failed to adhere to her treatment plan, failed to take prescribed medication, used illegal substances, and suffered from hallucinations. Eventually the government filed a petition to revoke Ms. Smith's outpatient status and reinstate her inpatient commitment. A hearing on that petition was held on March 6, 2003.[2]

## A. *The March 6 Hearing*

The hearing on March 6 consisted solely of testimony from Dr. Bota,[3] an attending psychiatrist at Saint Elizabeths Hospital. The doctor explained the circumstances surrounding Ms. Smith's rehospitalization on October 11, 2002, describing Ms. Smith's condition on admission as "quite

---

1. On April 14, 2000, after missing a psychiatric appointment and failing to respond to the clinic's attempts to locate her, Ms. Smith was returned to Saint Elizabeths by a police officer whose life she had threatened. Ms. Smith again fled from Saint Elizabeths on May 5, 2000, was involuntarily returned on July 10, 2001, and was transferred to outpatient status on August 13, 2001. On November 19, 2001, she was returned to Saint Elizabeths to undergo a court-ordered competency evaluation on a misdemeanor charge. On March 12, 2002, she was voluntarily rehospitalized, and two days later the court ordered her to re-

main hospitalized pursuant to her outpatient status. Ms. Smith was outplaced to the community on June 4, 2002.

2. The hearing was initially scheduled for November 6, 2002, but the parties consented to several continuances while the hospital searched—unsuccessfully—for a suitable outpatient placement.

3. The record does not reveal Dr. Bota's first name.

angry," "agitated," and "depressed," with slurred speech and a "disorganized thought process" that indicated "impaired" insight and judgment. Consistently with earlier diagnoses, Dr. Bota identified Ms. Smith's condition as "schizoaffective disorder, bipolar type, and cocaine abuse." Dr. Bota also acknowledged that, pending suitable arrangements, Ms. Smith had been ready for release since November 2002, but he warned that, if released without proper supervision, financial support, and housing, Ms. Smith would pose a danger to herself and others. Absent a stable environment, Ms. Smith would be likely to discontinue taking her medication and thus would deteriorate mentally and relapse into drug abuse and prostitution, as she had done on prior occasions. Given these possibilities, and with the knowledge that Ms. Smith was HIV-positive, the doctor concluded that Ms. Smith posed a high risk to herself and others if released.

Dr. Bota therefore recommended continued hospitalization as the least restrictive treatment alternative available to Ms. Smith until a suitable placement could be arranged. When the court pressed Dr. Bota to articulate why inpatient hospitalization was the least restrictive alternative, the doctor emphasized the risk that Ms. Smith would relapse into destructive behavior because of her mental illness and substance abuse. He stressed that Ms. Smith had previously been charged with soliciting for prostitution, had spent time in jail, and was still on probation.

At the conclusion of Dr. Bota's testimony, the government argued that the principal obstacles to placing Ms. Smith in an outpatient program involved securing approval for her social security application and replacing her case manager. The court reserved ruling on the petition until April 10, 2003, to give the hospital an additional thirty days to find a suitable outpatient placement. On April 10, however, the judge was unavailable, and the hearing was continued to May 1.

B. *The May 1 Hearing*

At the next hearing, the court considered whether, without a secure placement in the community, inpatient hospitalization was the least restrictive treatment alternative for Ms. Smith. The hospital still had not secured a placement for her, and the government asserted that the main reason for the delay was that Ms. Smith did not have an established social security benefit. Counsel for the government requested another two-week continuance because "everything's almost put in place." He said that, once the matter of social security benefits was resolved, it would take only two weeks for social workers to secure Ms. Smith's housing.

Appellant's counsel objected, arguing that Ms. Smith should be released immediately. Counsel asserted that Ms. Smith's detention was entirely due to social workers' concerns that the hospital had failed to resolve in nearly six months, and that Ms. Smith was no longer being detained for medical reasons since she had been medically ready to leave since November 2002. The court, recalling Dr. Bota's testimony about Ms. Smith's need for proper supervision to be in place before she could be released, continued the hearing for two weeks, to May 15, 2003. On that date the judge was again unavailable, however, and the hearing was rescheduled for May 19.

C. *The May 19 Hearing*

At the May 19 hearing, the court inquired about the status of the hospital's search for a suitable placement for Ms. Smith. Counsel for the government failed

to appear at the hearing.[4] The hearing proceeded, however, and after Ms. Smith's counsel presented her argument, the court granted the government's petition for revocation of Ms. Smith's outpatient commitment. The court ordered Ms. Smith to be committed indefinitely to Mental Health Services for inpatient treatment. Ms. Smith appeals from that order.

### D. *Subsequent Events*

After Ms. Smith was committed as an inpatient, she was eventually placed on outpatient status to receive treatment in the community.[5] On December 13, 2003, she was involuntarily returned to the hospital by clinical staff and police officers after exhibiting threatening behavior. On December 22, 2003, the government filed a new petition to revoke Ms. Smith's outpatient status. In support of that petition, the treating psychiatrist documented Ms. Smith's "long history of mental illness, substance abuse, and non-compliance with treatment." On January 15, 2004, the trial court ordered Ms. Smith to remain hospitalized. Ms. Smith again escaped from Saint Elizabeths on February 19, 2004. According to the government's brief, Ms. Smith was still on unauthorized leave from the hospital as of May 10, 2004. At oral argument, however, the parties informed us that appellant was returned to Saint Elizabeths on October 2, 2004. We have no further information about her status since that date.

II

Appellant raises several issues concerning the trial court's obligations when confronted with patients who have been detained for inpatient therapy even though they have been deemed medically fit for outpatient treatment. In the case before us, appellant was recommended for outpatient treatment as early as November 2002, but she was not released on an outpatient basis until August 2003.

■ Before a patient can be deprived of his or her liberty through revocation of an outpatient commitment, the court must find by "clear and convincing evidence," D.C.Code § 21–548(a) (2005 Supp.), that inpatient hospitalization is "the least restrictive alternative compatible with the ends of rehabilitation." *In re Richardson*, 481 A.2d 473, 479 n. 4 (D.C.1984) (citation omitted); *see also In re James*, 507 A.2d 155, 158 (D.C.1986). Appellant vigorously argues that at the May 19 hearing, the trial court failed to inquire adequately into the least restrictive alternative to total revocation of her outpatient commitment. At that hearing the court stated:

> It would appear that the government has made numerous efforts to find an outpatient placement that could serve the purposes of monitoring, and has been unable to at this point.

And all that would lead the Court to conclude that at this point inpatient

---

4. Early in the hearing, a social worker present in the courtroom identified himself as Ken Thong, a program manager at Anchor Mental Health. Mr. Thong stated that the government was still seeking a placement for Ms. Smith but had not yet been successful, despite "contact[ing] numerous community residence facilities," either because Ms. Smith did not meet facility guidelines or because spaces were unavailable. The court promptly prevented Mr. Thong from speaking any further because he had not been sworn as a witness.

5. The record does not reveal the date on which Ms. Smith was restored to outpatient status or the circumstances surrounding her release, but appellant's reply brief states that she was released with permission on August 6, 2003. Ms. Smith's eventual release is consistent with the testimony of the medical staff and case workers who said that she would be placed on outpatient status as soon as appropriate monitoring, financial, and housing arrangements could be secured.

[commitment] is the least restrictive alternative, there being no other right now in the community to address certain needs that have brought her back to the Court for revocation. And while I think it is a very close call, I'm going to grant the petition to revoke.

Like the appellant in *Lake v. Cameron*, 124 U.S.App. D.C. 264, 364 F.2d 657 (1966) (en banc), appellant in the instant case "does not know and lacks the means to ascertain what alternatives, if any, are available, but the government knows or has the means of knowing and should therefore assist the court in acquiring such information." *Id.* at 268, 364 F.2d at 661.[6] It is not clear from the record whether less restrictive alternatives were investigated enough to establish that appellant's illness required the complete deprivation of liberty that resulted from total revocation of her outpatient status.

It does appear from the record, however, that the trial court may have believed it was forced to choose between total revocation and allowing appellant's release, absent certain assurances regarding her care. But a hearing on a petition to revoke an outpatient commitment involves more than a binary choice. As we have said before, when inpatient therapy is no longer clinically required and medical authorities have deemed a patient suitable for outpatient treatment, the trial court must consider the entire range of options available. *See In re Mills*, 467 A.2d 971, 974–975 (D.C.1983) ("the statutory scheme in this jurisdiction does not limit the court in a commitment proceeding to a polarized choice between indefinite hospitalization and unconditional release"); *see also Lake*, 124 U.S.App. D.C. at 266–267, 364 F.2d at 659–660 (court must consider "the entire spectrum of services").

Appellant asks us to remand this case to the trial court for a more thorough inquiry into the "least restrictive alternative" available for her treatment. On such a remand, she maintains, the court could ensure that the government's efforts to place her in the community sufficiently adhered to the instruction in *Lake* that "every effort should be made to find a course of treatment which appellant might be willing to accept." *Lake*, 124 U.S.App. D.C at 268, 364 F.2d at 661. The court could thus be kept abreast of the government's progress in securing the arrangements necessary for her housing, personal care, and financial needs in the event of release. Although we agree that such an inquiry would be consistent with *Lake* and other authorities, *see In re Plummer*, 608 A.2d 741, 748 (D.C.1992) (Rogers, C.J., concurring) (citing cases), we conclude that a remand for that purpose is not warranted here because intervening events have made this appeal moot.

### III

■■■■ Our duty as a court "is to decide actual controversies by a judgment which can be carried into effect, and not to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before [us]." *Mills v. Green*, 159 U.S. 651, 653, 16 S.Ct. 132, 40 L.Ed. 293 (1895). Events occurring during the pendency of an appeal can also make the appeal moot. *See SEC v. Medical Committee for Human Rights*, 404 U.S. 403, 405–406, 92 S.Ct. 577, 30 L.Ed.2d 560 (1972). The party asserting that a case is moot bears the burden of proving it. *In re Morris*, 482 A.2d 369, 371 (D.C. 1984).

**6.** *Lake* is binding on this court under *M.A.P. v.*     *Ryan*, 285 A.2d 310, 312 (D.C.1971).

■ In the case before us, appellant was released from the hospital on August 6, 2003, during the pendency of this appeal. Although the government acknowledges that appellant's release from inpatient to outpatient status may not necessarily moot her claim, *see id.* at 371–372, it contends that this particular appeal has been rendered moot by her latest return to inpatient therapy and the pendency of a new petition to revoke her outpatient status, which has initiated a new and independent proceeding. In response, appellant continues to maintain that the trial court erred in its order of May 19, 2003, revoking her outpatient status and committing her to Saint Elizabeths for an indefinite period. She therefore asks us to vacate that order and reinstate her outpatient status. In December 2003, however, appellant was involuntarily returned to Saint Elizabeths after reverting to violent behavior which threatened her safety and the safety of others. Her relapse into aggression and non-compliance with treatment resulted in a trial court order entered January 15, 2004, requiring her continued inpatient hospitalization. At oral argument we were informed that new proceedings were already under way in the trial court to determine whether to revoke her release status.

Because of these events, a remand to correct an order that no longer affects Ms. Smith's custodial status would have no effect on her current situation. Appellant's status is now controlled by the January 2004 order, not the May 2003 order. Furthermore, any future revocation hearings will be controlled by D.C.Code § 21–548 (2005 Supp.), enacted in 2003, in which the Council of the District of Columbia, for the first time, established detailed procedures to govern the revocation of a committed person's outpatient status and expressly prescribed, in subsection (a), that the need for more restrictive treatment must be proved by clear and convincing evidence. Thus the principal issue that appellant raises in this appeal, whether the clear and convincing standard should be applied retrospectively, is not an issue likely to recur. *Cf. Southern Pacific Terminal Co. v. ICC,* 219 U.S. 498, 515, 31 S.Ct. 279, 55 L.Ed. 310 (1911) (holding that case could be decided on the merits despite its mootness because issue was "capable of repetition, yet evading review"); *In re A.C.,* 573 A.2d 1235, 1242 (D.C.1990) (en banc).

Although we have not previously addressed this particular factual situation, we find support for dismissal under these circumstances in analogous cases. In *In re Plummer, supra,* a group of related appeals in a civil commitment case, the appellant challenged the revocation of his outpatient status on several grounds, but we dismissed as moot his appeal from the order revoking his outpatient status after that status was restored. 608 A.2d at 746 n. 7. *See also Brown v. United States,* 682 A.2d 1131, 1141 n. 9 (D.C.1996) (in criminal case, insanity acquittee's request for a remand to establish procedures to be followed for temporary return of acquittees to the hospital "appear[ed] to be moot and [came] within no exception to the mootness doctrine"). Following these and similar cases, we conclude that the government has met its burden of showing that the present appeal from the trial court's order of May 19, 2003, is moot and that the issue raised is unlikely to evade review, so that we need not attempt to resolve any of the substantive questions presented. We hold that once a new order determining the status of a committed mental health patient is in effect, it supersedes any prior order on the same matter and renders moot an appeal from the prior order, unless there are collateral effects from the prior order resulting in prejudice to the

patient. Appellant does not claim that she has suffered any collateral prejudice from the May 2003 commitment order, nor can we discern any such prejudice from the record.

This appeal is therefore

*Dismissed as moot.*