**Mary Hooker ROBINSON, Appellant,**

**v.**

**Gregory D. ROBINSON, Appellee.**

**No. 04–FM–843.**

District of Columbia Court of Appeals.

Argued Sept. 22, 2005.
Decided Nov. 3, 2005.

Danielle Spinelli, Washington, for appellant.

Gilda Sherrod–Ali, Washington, for appellee.

Kenneth E. Noyes and Lisa Vollendorf Martin were on the brief for the District of Columbia Coalition Against Domestic Violence and Women Empowered Against Violence, Inc., as amici curiae.

Before SCHWELB, RUIZ, and GLICKMAN, Associate Judges.

RUIZ, Associate Judge:

This is an expedited appeal from an order granting in part and denying in part a motion to amend a civil protection order (CPO). Appellant, Mary Hooker Robinson, challenges the trial court's denial of her request that the CPO require her husband, Gregory D. Robinson, to vacate and stay away from their jointly-owned property, located next door to her current residence. Because it appears, in the context of the trial court's findings, that the trial court may have accorded too much weight to appellee's property rights to the disadvantage of appellant's safety, we remand to the trial court for further proceedings.

## I.

Mr. and Mrs. Robinson, at the time of the CPO was issued, had been married for approximately thirty years. They hold joint title to two neighboring properties in the District of Columbia, one at 1224 Emerson Street, N.W., and the other right next door at 1228 Emerson Street, N.W. The houses are stand-alone properties, approximately ten to twelve feet apart. Several years before the events that led to the CPO, the Robinsons' son had fallen victim to gun violence.[1] Mrs. Robinson was reno-

---

1. Although the trial judge in the CPO proceedings did not make findings concerning

vating 1228 Emerson Street so that it could be used as the office of a non-profit organization she planned to start to address violence among young people in the community.

On April 11, 2003, Mrs. Robinson filed a petition seeking a CPO against Mr. Robinson, pursuant to the Intrafamily Offenses Act. D.C.Code § 16–1003 (2001). In the petition, Mrs. Robinson stated that her husband had barricaded the door to their home at 1224 Emerson Street and refused to let her in the house, and that he had destroyed her personal property. She sought a CPO ordering Mr. Robinson to stay away from her, not to abuse, threaten, harass, or otherwise contact her, and to vacate 1224 Emerson Street. She also sought a temporary protection order (TPO) pending a hearing on the CPO.

A hearing on the TPO was held the same day. Mrs. Robinson testified that she previously had obtained a TPO against her husband in 1998, when he physically attacked her. "Since then," she testified, "it has been mental abuse, verbal abuse . . . ." She testified that she had filed the petition for a CPO because Mr. Robinson had locked her out of the house and was destroying her personal property, and she was afraid of further violence. The court granted a fourteen-day TPO and set a hearing on the petition for a CPO for April 25, 2003. Mrs. Robinson failed to appear at the April 25, 2003 hearing, and the CPO petition was dismissed.

On October 7, 2003, Mrs. Robinson filed a motion to reinstate her petition for a CPO, and again sought a temporary protection order. At a hearing on the tempo-rary protection order, she testified that she was seeking to reinstate the petition because her husband had again locked her out of the house and was threatening her. The court granted a fourteen-day TPO pending the hearing on the petition for a CPO.

On October 21, 2003, the CPO hearing was held. At the hearing, Mrs. Robinson testified in more detail about the particular incidents that prompted her April 11 petition and October 7 motion to reinstate the petition. She explained that in the very early morning of April 11, 2003, the day she filed the petition, she had come home to find the outside lights had been turned off and that her key would not open the door. She called the police, who discovered that Mr. Robinson was inside the house and had barricaded the front door with an armoire to prevent her from entering the house. After much negotiation between the police and Mr. Robinson, he finally allowed Mrs. Robinson in the house to retrieve her clothing and diabetes medication.

Mrs. Robinson testified that a similar incident occurred on October 7, 2003, causing her to seek to reinstate the CPO petition. On that date, she returned to the house late at night to find that Mr. Robinson had damaged the lock to prevent her from entering. She called him asking to be let in, informing him that she needed her medication, but he refused. She also testified that, on other occasions, Mr. Robinson had acted "in a threatening manner," using his physical size to intimidate her; that he had destroyed personal property with sentimental value to her; that he had

the impact of the son's murder on his parents' deteriorating relationship, in the order of divorce granted earlier this year, Judge Robert Morin made the following finding of fact: "One thing is clear: both parties have suffered great emotional and psychological turmoil as a result of the murder of their adult son. Much of the parties' turmoil and conflict began after the loss of their son. Each coped differently with their grief." *Robinson v. Robinson*, Nos. DR–733–04 & IF–1100–03, at 13 (D.C.Super.Ct. July 19, 2005).

verbally abused her; and that he had told her that she was "worth more to [him] dead than alive."

The trial court granted a CPO that ordered Mr. Robinson not to assault, threaten, harass or stalk his wife, destroy her property, or lock her out of the house. The CPO did not, however, require Mr. Robinson to vacate the couple's shared residence at 1224 Emerson Street, as requested. In its findings, the court stated that the "denial of access to the house certainly was a problem causing harm here." It stated that it credited Mrs. Robinson's testimony that her husband had told her she was "worth more dead than alive," despite his denial. As a result, the court found, pursuant to D.C.Code § 16–1005(c),[2] that there was good cause to believe that Mr. Robinson had committed or was threatening to commit an intrafamily offense, and granted the CPO.

On December 1, 2003, Mrs. Robinson filed a motion to adjudicate Mr. Robinson

in criminal contempt for violating the CPO. *See* D.C.Super. Ct. Dom. Violence R. 12(d) (2001); D.C.Code § 16–1005(f-g) (2005). In her sworn statement in support of that motion, Mrs. Robinson stated that Mr. Robinson had "followed [her] throughout the house calling her names and threatening her," that he had "knock[ed] her backwards," and that he had "threatened to do bodily harm" to her.

At around the same time, on December 3, 2003, Mrs. Robinson filed a motion to modify the CPO. In the motion, she stated that her husband had violated the CPO by harassing and threatening her. She explained that she believed her life was in imminent danger because of the threats Mr. Robinson was directing at her. She stated that he was smoking marijuana and drinking alcohol regularly, and that he had stolen her laptop computer, cell phone, and her keys to the house and cars. She stated that the "constant increasing threats" and actions were disrupting her "life, livelihood, and health on a daily basis." She

2. D.C.Code § 16–1005(c) provides:

If, after hearing, the Family Division finds that there is good cause to believe the respondent has committed or is threatening an intrafamily offense, it may issue a protection order-

(1) directing the respondent to refrain from the conduct committed or threatened and to keep the peace toward the family member;

(2) requiring the respondent, alone or in conjunction with any other member of the family before the court, to participate in psychiatric or medical treatment or appropriate counseling programs;

(3) directing, where appropriate, that the respondent avoid the presence of the family member endangered;

(4) directing a respondent to refrain from entering or to vacate the dwelling unit of the complainant when the dwelling is (A) marital property of the parties; or (B) jointly owned, leased, or rented and occupied by both parties; provided, that joint occupancy shall not be required if a party is forced by the respondent to relinquish occupancy;

or (C) owned, leased, or rented by the complainant individually; or (D) jointly owned, leased, or rented by the complainant and a person other than the respondent;

(5) directing the respondent to relinquish possession or use of certain personal property owned jointly by the parties or by the complainant individually;

(6) awarding temporary custody of a minor child of the parties;

(7) providing for visitation rights with appropriate restrictions to protect the safety of the complainant;

(8) awarding costs and attorney fees;

(9) ordering the Metropolitan Police Department to take such action as the Family Division deems necessary to enforce its orders;

(10) directing the respondent to perform or refrain from other actions as may be appropriate to the effective resolution of the matter; or

(11) combining two or more of the directions or requirements prescribed by the preceding paragraphs.

requested that the CPO be modified to order Mr. Robinson to stay away from both 1224 and 1228 Emerson Street. Mrs. Robinson also requested a TPO until the CPO could be modified.

The same day, a hearing was held before Magistrate Judge Dennis Doyle on Mrs. Robinson's request for a TPO. At the hearing, she testified that Mr. Robinson had been using drugs and alcohol regularly, which changed his behavior, turning him into a "very violent person" and that "he's totally out of control." She stated that the threats are "daily, they're constant," and that he told her the previous day, "you can die with your lies. . . . I can and will hurt you." She also testified that he walked into her forcibly, pushing her back and down. When asked if she believed she was in danger from him, she answered "I know I am."

Magistrate Judge Doyle issued a fourteen-day TPO ordering Mr. Robinson to vacate 1224 Emerson Street immediately; to stay at least 100 feet away from Mrs. Robinson, 1224 and 1228 Emerson Street; to return her laptop, phone, and keys; and to not contact or harass her.

After several continuances, the parties appeared before Judge Jeanette Clark on April 7, 2004. At the hearing, Judge Clark arraigned Mr. Robinson on the criminal contempt charges, to which he pleaded not guilty. In conjunction with setting the conditions for Mr. Robinson's release pending trial on the contempt charges, Judge Clark modified the October 21, 2003 CPO, ordering Mr. Robinson to stay at least 50 feet away from his wife, her home, workplace, and vehicle, and not to contact her. Judge Clark did not at that time rule on Mrs. Robinson's December 3, 2003 motion to modify the CPO, which remained pending.

On June 3, 2004, Judge Clark held a hearing on Mrs. Robinson's December 3, 2003 motion to modify the CPO. At that hearing, Mrs. Robinson withdrew the pending contempt motion. In support of her motion for modification of the CPO, Mrs. Robinson testified in detail about Mr. Robinson's increasingly abusive, threatening, and erratic behavior, and her fear for her safety if he remained nearby.

Mrs. Robinson described the two incidents in April 2003 and October 2003 in which Mr. Robinson had barricaded the door or damaged the lock at 1224 Emerson Street in order to prevent her from entering the house. She explained that the situation did not improve after entry of the October 21, 2003 CPO, which ordered Mr. Robinson not to threaten or harass her, but allowed him to stay at the couple's house at 1224 Emerson Street. "In fact," she testified, "the problems escalated." She testified that he had begun drinking heavily on a daily basis, and that his verbal abuse had intensified; he "call[ed her] all kinds of belligerent names and bitches and whores." She stated that he also physically intimidated her: "[H]e would . . . put his hands up and then stick his chest out and walk into me and . . . force me to fall . . . . Or he would come into the room . . . and scream . . . and walk up to me and hover over me. I'm five feet two, he's 6′4″. He would hover over me and jeer down at me . . . ."

Mr. Robinson also began to steal and hide Mrs. Robinson's personal property. She testified that he first took her cellular telephone. After realizing that her telephone was missing, she asked Mr. Robinson where it was. She testified that he refused to tell her, but said, "I know something else I can take and it's going to really hurt you. You know, this is going to really hurt you . . . you're going to be crying." She soon found that her laptop computer was also missing. Mr. Robinson

admitted taking Mrs. Robinson's telephone and computer and hiding them from her.

Mrs. Robinson introduced into evidence tape-recorded conversations with her husband in which he accused her of having stolen his family photographs and repeatedly asked her where the pictures were. In those conversations, Mr. Robinson admitted to using alcohol and illegal drugs; verbally abused Mrs. Robinson; and threatened her with bodily harm. In one instance, he woke Mrs. Robinson up just before midnight to threaten her, calling her "a sick, demented, evil piece of shit," and telling her, "I will hurt you," and "[Y]ou're going to die with your lies." [3] Mr. Robinson admitted that he made these statements, but testified they were in response to what he supposed were Mrs. Robinson's repeated, intentional provocations designed to get him out of the house. He denied ever having threatened her with bodily harm, or ever hitting or pushing her, stating "I've never physically attacked my wife." When confronted with audiotape recordings of him stating "I will hurt you," Mr. Robinson claimed he did not mean physical harm.

Mrs. Robinson explained that she found her husband's behavior "real scary," and that she felt it was necessary for the CPO to order him to stay away from the couple's residence at 1224 Emerson Street and from the house next door at 1228 Emerson Street. She testified that 1228 Emerson Street was "a house that I purchased after my son was murdered to turn into a nonprofit to help deal with violence ... young people are facing," and that she had "taken sole financial responsibility" for the property. That property was "right next door" to the couple's residence at 1224 Emerson Street, only about ten to twelve feet away. Indeed, Mrs. Robinson testified, the houses are so close together that a person at 1228 Emerson Street can "see right into" the windows at 1224 Emerson Street.

Based on the evidence presented at the hearing, the court found that Mrs. Robinson had met her burden of proof "to some extent." The court credited her testimony that she was in "fear of her safety," and noted that the court's "main concern [was] for the safety of everyone concerned." The court also found that Mr. Robinson had threatened Mrs. Robinson with bodily harm: "I will hurt you. Those are words that I heard and heard myself and have recorded as part of my notes. I will hurt you, Mary, is what he said and that is a threatening statement." The court concluded that the situation was sufficiently grave that "it could result in some very tragic violence, and, at this point, the Court does not believe the parties can live together." Mr. Robinson's conduct, the court found, was "harassing to the point of having violated the civil protection order," but did not necessarily rise to the point of being "an intrafamily offense."

The court granted Mrs. Robinson's request to order Mr. Robinson to vacate the couple's house at 1224 Emerson Street. The court, however, refused to order that Mr. Robinson stay away from the property next door at 1228 Emerson Street, reasoning that "[t]he two houses are in the names of both individuals ... 1228 Emerson [is Mr. Robinson's] property, until the Divorce Court divides up the property ... He should have access to that property ... If he so chooses to live in [1228 Emerson Street] until [the] divorce is final, then he

---

3. Mr. Robinson had threatened not only her, Mrs. Robinson testified, but also people around her: "He'd ... threatened to stab ... a young man that I mentored, James, ... in the head with scissors," and had "threatened to kill" the people renovating 1228 Emerson Street.

certainly has a right to do that."[4] The court specifically addressed Mr. Robinson, stating: "Now, with me allowing you, sir, to stay at the 1228 Emerson Street property, it is property in your name, that does not mean that you have any access to the petitioner. You are still ordered under the civil protection order not to threaten or harass or assault her. Do you understand, sir?" Mr. Robinson responded, "Yes, I do."

The following day, on June 4, 2004, Mrs. Robinson filed a motion seeking reconsideration of the portion of the modified CPO that permitted Mr. Robinson to move into 1228 Emerson Street, explaining that she feared for her safety if he were permitted to live there. The motion stated that, immediately after the June 3 hearing, Mrs. Robinson had encountered Mr. Robinson in a parking garage near the court, and that he had threatened her by "slic[ing] his finger across his neck" and then pointing at her. The motion was set for hearing but dismissed when Mrs. Robinson failed to appear. On July 6, 2004, Mrs. Robinson filed this appeal of Judge Clark's June 3, 2004 order.

The CPO, as modified by Judge Clark's order, would have expired by its terms on October 21, 2004. On October 20, 2004, however, Mrs. Robinson returned to court seeking an extension of the CPO. On November 5, 2004, the court (Robert R. Rigsby, J.) initially extended the CPO until December 8, 2004. On that day, Judge Rigsby held a hearing, at which Mrs. Robinson testified that Mr. Robinson had continued to harass her from 1228 Emerson Street, monitoring her comings and goings; intimidating her visitors; destroying her property; breaking into the garage of her home; and repeatedly frightening her by driving up to within a foot of her car

and staying there while she got out of the car. She stated that she had developed a heart murmur and other very serious illnesses, "and this stuff is just stressing me out."

The court found good cause to conclude that Mr. Robinson had committed or was threatening an intrafamily offense, and extended the CPO for another full year, until December 8, 2005. The trial court stated in its oral findings that Mr. Robinson was to stay at least 100 feet away from Mrs. Robinson, but would be allowed to continue to live next door to her. Mr. Robinson was also ordered to stay away from 1224 Emerson Street. The written order provided that Mr. Robinson was to stay at least 100 feet away from Mrs. Robinson and her home at 1224 Emerson Street, but was silent with respect to Mr. Robinson's residing at 1228 Emerson Street. After that order was entered, Community Supervision Services ("CSS") visited Mr. Robinson and found that he was still living at 1228 Emerson Street—much less than 100 feet away from Mrs. Robinson's home at 1224 Emerson Street. The CSS sent a memorandum to Judge Rigsby, asking him whether his December 8, 2004 order intended to alter the terms of Judge Clark's June 3, 2004 order. Judge Rigsby subsequently modified his order extending the CPO to make clear that it conformed with the terms of Judge Clark's June 3, 2004 order.

## II.

■ We first address the issue of mootness. Mr. Robinson contends that the parties' recent order of divorce moots the question before us. We disagree. In proceedings separate from those before us, Judge Robert Morin granted Mr. Robin-

---

4. The court had previously asked Mr. Robinson where he was living at the time; he responded that he was "homeless" and living in motels.

son's petition for divorce, divided the parties' property, and specifically ordered that the home at 1228 Emerson Street be sold and the proceeds divided between the parties, unless Mrs. Robinson can refinance the home and buy out Mr. Robinson's share. *Robinson v. Robinson*, Nos. DR–733–04 & IF–1100–03 (D.C.Super.Ct. July 26, 2005). That divorce order, however, has been appealed, and, as of the time of oral argument in this case, Mr. Robinson was still residing at 1228 Emerson Street, N.W. Therefore, the divorce has not mooted this matter.

■ There is another possible ground for finding this appeal moot. The CPO on appeal here, as modified by Judge Clark on June 3, 2004, expired on October 21, 2004. Mrs. Robinson returned to the trial court on October 20, 2004, seeking an extension of the CPO. It was temporarily extended by Judge Rigsby on November 5, 2004, and further extended, for an additional year, by order of Judge Rigsby on December 8, 2004, when he presided over a full hearing on the matter. It remains in effect until December 8 of this year. Since Judge Clark's order expired on October, 21 2004, and has been superseded by the current civil protection order, this appeal is moot. This court, however, has the authority to hear and decide appeals from civil protection orders even when they are technically moot, under certain circumstances.

In *Cloutterbuck v. Cloutterbuck*, we agreed to hear an appeal from the grant of a CPO even though it had expired by the time the court reached its decision. 556 A.2d 1082, 1084 n. 1 (D.C.1989). The court recognized that appeals from CPOs, given their short duration, are "capable of repetition, yet evading review." *Id.* (citing *United States v. Edwards*, 430 A.2d 1321, 1324 n. 2 (D.C.1981)). In addition, parties subject to and benefitting from CPOs, "by virtue of the parties' ongoing relationship" are often likely to be involved in further proceedings of the same kind. *Id.* Therefore, courts should not decline to hear the matter where there is a reasonable expectation that the parties will be subject to the same actions again. *See id.* (citing *Weinstein v. Bradford*, 423 U.S. 147, 149, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975)); *see also Green v. Green*, 642 A.2d 1275, 1278 n. 4 (D.C.1994) (citing *Cloutterbuck* for the proposition that where parties, such as those then before the court, are engaged in a contentious relationship, CPOs may require repetition and therefore may continue to evade review). Subsequent to *Cloutterbuck*, this court has twice decided to hear technically moot challenges to expired CPOs. *See McKnight v. Scott*, 665 A.2d 973, 975 n. 1 (D.C.1995); *Green*, 642 A.2d at 1278 n. 4.

This appeal is from an order indeed likely to continuously evade review. Judge Clark's June 3, 2004 order, which modified an existing CPO, expired on October 21, 2004, roughly four and a half months after its issuance. Even though the appeal was expedited, it has been well over a year since Judge Clark's order was issued and the notice of appeal filed.[5] Appellant still has the same interest at stake: her physical and emotional safety, which she claims appellee continues to threaten. Therefore, following the precedent of *Cloutterbuck*, *McKnight*, and *Green*, we will not dismiss this matter as moot.[6]

---

5. The record did not become available until April 29, 2005. The parties' briefing was completed on July 22, 2005, and this court heard oral argument on September 22, 2005.

6. This case differs from the court's recent decision in *In re Greta Smith*, where we concluded that intervening events occurring since the time of the issuance of the original commitment order, including subsequent proceed-

### III.

■ Mrs. Robinson argues that the trial court abused its discretion in failing to consider the "entire mosaic" of facts before it. *Cruz–Foster v. Foster,* 597 A.2d 927, 930–32 (D.C.1991) (vacating and remanding a denial of a CPO because it was not clear the trial judge took into account the "entire mosaic" of facts). She asserts that the trial court allowed Mr. Robinson to live at 1228 Emerson Street simply because he had ownership rights in that property, despite his violent and threatening behavior toward her. By emphasizing this property right, rather than considering it as only one factor in the totality of the circumstances, including Mr. Robinson's violations of the CPO, Mrs. Robinson argues that the trial court committed legal error.

The trial court's order modifying the CPO betrays a tension between its finding that potentially "tragic violence" might occur between the parties and its decision to allow Mr. Robinson to live within twelve feet of Mrs. Robinson. The trial court, after hearing an abundance of evidence documenting the history of contention between the parties and the continuous harassment by Mr. Robinson, found that Mr. Robinson had violated the existing CPO. The trial court further found that: (1) it believed the testimony of Mrs. Robinson "that she certainly felt some fear of her safety when [Mr. Robinson] was talking"; (2) "it's clear that the parties have a lot of tension," and that its "main concern is for the safety of everyone concerned," particularly because of Mr. Robinson's admitted drinking and drug use; (3) Mr. Robinson had "persisted, persisted, per-

sisted to basically nag her, to constantly harass her"; (4) Mr. Robinson's behavior contributed to a "very destructive living arrangement and certainly could result in worse behavior than what took place"; (5) Mr. Robinson threatened to hurt Mrs. Robinson; and (6) the tension between them "could result in some very tragic violence ...."

Given the court's findings that Mr. Robinson had violated the CPO and there was a likelihood of future violence, its order requiring Mr. Robinson to vacate the marital home, but allowing him to live right next door, seems inadequate to accomplish the broad remedial purpose of the Intrafamily Offenses Act, that is, to protect victims of family abuse from both acts and threats of violence. *See, e.g., Cruz–Foster,* 597 A.2d at 930–31. In furtherance of this broad purpose, the Act clearly envisions allowing safety concerns to trump property rights. *See* D.C.Code § 16–1005(c)(4). Although ordering a person to vacate his or her home or denying the use of owned property is a serious step, not to be lightly undertaken, when the trial court finds that intra-family offenses have been committed or are imminent, it can be a necessary measure to ensure peace and safety. While we do not believe that the trial court thought it was powerless to grant a stay-away order because Mr. Robinson had property rights in the house next to Mrs. Robinson's residence, the trial court appears to have placed significant reliance on Mr. Robinson's property rights in allowing him, a known abuser, to live within twelve feet of his wife, his repeated vic-

ings and orders, rendered the appeal moot. 880 A.2d 269, 275 (D.C.2005) ("A remand to correct an order that no longer affects [appellant's] custodial status would have no effect on her current situation."). Although subsequent orders have been issued in this case,

they have incorporated and specifically deferred to Judge Clark's determinations regarding Mr. Robinson's right to live in 1228 Emerson Street. Therefore, the substance of Judge Clark's order remains very much alive and its findings ripe for review.

tim.[7] On this record, we are not convinced that the trial court's decision rested on correct legal principles. *See Johnson v. United States,* 398 A.2d 354, 365 (D.C. 1979) (noting that reliance on an improper factor can constitute abuse of discretion); *Cruz–Foster,* 597 A.2d at 931–32 (stating that although the trial court's discretion in granting CPOs is broad, the court was "uncertain from the judge's brief articulation of her reasons whether its exercise rested on correct legal principles").[8]

Accordingly, we remand the case to the trial court so that it may re-evaluate the situation of the parties, considering the entire mosaic of facts before it (including any developments since the entry of the last order), as well as the broad remedial measures available to safeguard Mrs. Robinson's safety and peace of mind. *See Maldonado v. Maldonado,* 631 A.2d 40, 43 (D.C.1993) (finding an important factor in issuing a CPO is that it "provides a measure of peace of mind for those for whose benefit it was issued").

*So ordered.*

---

7. In its findings, the court focused on Mr. Robinson's property rights, stating: (1) the two houses were in the names of both parties; (2) that 1228 Emerson Street was "his property"; (3) "he should have access to that property"; (4) that he has "a right" to live in the property until the divorce is final, "[i]f he so chooses"; and (5) "it is property in [his] name."

8. At oral argument, Mr. Robinson's counsel interpreted the trial court's order as a measured response, which increased the separation between the parties, who could no longer live together in the same house, but who would coexist without threat of violence as next-door neighbors. We are doubtful that the trial court's findings support that interpretation. The trial court will have an opportunity to fully explain its reasons on remand.