*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 14-FM-1006

ALFREDO SALVATTERA, APPELLANT,

v.

ISELA RAMIREZ, APPELLEE.

Appeal from the Superior Court of the District of Columbia
(CPO-1015-14)

(Hon. Fern Flanagan Saddler, Trial Judge)

(Argued September 17, 2014                    Decided December 15, 2014)

*Robert Hornstein*, Public Defender Service, with whom *James Klein*, *Samia Fam*, *Angela Kennedy Acree*, and *Dominque Winters*, Public Defender Service, were on the motion, for appellant.

*Rachel L. Applestein*, with whom *Donald P. Salzman* and *Luke A. Meisner*, were on the motion, for appellee.

Before GLICKMAN and EASTERLY, *Associate Judges*, and KING, *Senior Judge*.

Opinion for the court by *Associate Judge* EASTERLY.

Dissenting opinion by *Associate Judge* GLICKMAN at page 14.

EASTERLY, *Associate Judge*: This matter comes before the court on appellant Alfredo Salvattera's emergency motion for a stay pending appeal. On August 26, 2014, the Superior Court determined that there was good cause to believe that Mr. Salvattera had had unwanted sexual contact with appellee Isela Ramirez, thereby committing misdemeanor sexual abuse. The court issued a one-year Civil Protection Order (CPO) generally directing Mr. Salvattera to have no contact with Ms. Ramirez and specifically directing Mr. Salvattera to vacate his apartment—an apartment which he does not share, and has never shared, with Ms. Ramirez and in which she has no ownership or possessory interest, but which is located in the same building as Ms. Ramirez's apartment. Mr. Salvattera filed a motion under Superior Court Rule of Civil Procedure 59 (e) arguing that the vacate order exceeded the Superior Court's statutory remedial authority under D.C. Code § 16-1005 (c) (2012 Repl.), and a motion for a stay pending appeal. Both motions were denied. In this court Mr. Salvattera has filed a notice of appeal and renewed his request for a stay of the vacate order, again challenging the court's statutory authority to issue it. After granting Mr. Salvattera an administrative stay, this court, on September 17, 2014, held oral argument on Mr. Salvattera's motion for a stay of the vacate order pending appeal. We now grant Mr. Salvattera the requested stay. The remainder of the CPO remains in force.

"To prevail on a motion for stay, a movant must show that he or she is likely to succeed on the merits, that irreparable injury will result if the stay is denied, that opposing parties will not be harmed by a stay, and that the public interest favors the granting of a stay." *Barry v. Washington Post Co.*, 529 A.2d 319, 320-21 (D.C. 1987). "These factors interrelate on a sliding scale and must be balanced against each other." *Serono Labs.*, *Inc. v. Shalala*, 158 F.3d 1313, 1318 (D.C. Cir. 1998).[1] Conducting this balancing of the second and third factors, we conclude that they more or less cancel each other out. Although we acknowledge that Mr. Salvattera will suffer irreparable harm if he is forced to move out of his home, Ms. Ramirez represents that she too will suffer harm if Mr. Salvattera remains, because she cannot continue to live in the same apartment building where he lives.[2] Thus, our resolution of this motion turns on the likelihood the Mr. Salvattera will succeed on

---

[1] *See also Akassy v. William Penn Apartments Ltd. P'ship*, 891 A.2d 291, 310 (D.C. 2006) ("A stay may be granted with either a high probability of success and some injury, or *vice versa*." (quoting *Cuomo v. U.S. Nuclear Regulatory Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985)) (brackets omitted)).

[2] We note, however, that there was a four-month span of time between the date of the alleged assault forming the basis for Ms. Ramirez's request for a CPO and the date Ms. Ramirez came to court and filed her CPO request. During that time Ms. Ramirez continued to live without incident in the same apartment building as Mr. Salvattera, except for one encounter when she saw him, not in their building, but standing on the street by his car as she went outside to take out the trash.

the merits of his argument that the Superior Court acted extralegally, coupled with the determination that the public interest accordingly favors a stay.

When the Superior Court initially issued the vacate order it did not cite to any specific provision of the Intrafamily Offenses Act as authorizing this directive. We assume it relied on the provisions Ms. Ramirez had cited to the court: D.C. Code §§ 16-1005 (c)(4) and (c)(11). We examine each provision in turn.

D.C. Code § 16-1005 (c)(4) addresses when a court, having determined that the petitioner is entitled to a CPO, may take the significant step of ordering a respondent to vacate the petitioner's "dwelling unit." D.C. Code § 16-1005 (c)(4). The court may do so if the dwelling unit is:

- "Marital property of the parties," D.C. Code § 16-1005 (c)(4)(A)—inapplicable in this case because Mr. Salvattera and Ms. Ramirez are not married;

- "Jointly owned, leased, or rented and occupied by both parties; provided, that joint occupancy shall not be required if the respondent's actions caused the petitioner to relinquish occupancy," D.C. Code § 16-1005 (c)(4)(B)—inapplicable in this case because Mr. Salvattera did not jointly possess and occupy a residence with Ms. Ramirez and never had;[3]

---

[3] Rather, the court determined that they were mere acquaintances who lived in the same apartment building.

- "Owned, leased, or rented by the petitioner individually; or Jointly owned, leased, or rented by the petitioner and a person other than the respondent," D.C. Code §§ 16-1005 (c)(4)(C), (D)—inapplicable in this case because the court ordered Mr. Salvattera to vacate *his* apartment, not an apartment in which Ms. Ramirez had any ownership or possessory interest.

Indeed, Ms. Ramirez was eligible to seek a CPO under D.C. Code § 16-1003 (2012 Repl.), only because she falls under the newly expanded definition for "petitioner," which, as revised in 2007 and then 2009,[4] now includes not only individuals who allege they are the victims of "interpersonal, intimate partner, or intrafamily violence" and who thus might be expected to have the dwelling arrangements described above, but also all individuals who allege they are victims of stalking, sexual assault, or sexual abuse, without regard to whether they have any current or prior relationship or domestic arrangement with the alleged perpetrator. D.C. Code § 16-1001 (12) (2012 Repl.). Because (c)(4) was not amended to afford relief to individuals who, like Ms. Ramirez, fall in this latter category, D.C. Code § 16-1005 (c)(4) does not authorize the court's vacate order in this case.

Ms. Ramirez also cited D.C. Code § 16-1005 (c)(11) as a basis for the court's authority to order Mr. Salvattera to vacate his apartment. And in fact this

---

[4] D.C. Law Nos. 16-306 § 206 (a), 17-368 § 3 (b)(2).

was the statutory authority the Superior Court relied upon in its order denying Mr. Salvattera's Rule 59 (e) motion to Alter or Amend the Judgment. Section 16-1005 (c)(11) is a catchall provision; it authorizes a court issuing a CPO to "[d]irect[] the respondent to perform or refrain from other actions as may be appropriate to the effective resolution of the matter." D.C. Code § 16-1005 (c)(11). For the purpose of assessing Mr. Salvattera's likelihood of success on the merits, we do not think D.C. Code § 16-1005 (c)(11) can be read so broadly as to authorize the vacate order in this case. Instead we understand D.C. Code § 16-1005 (c)(4) to define all circumstances under which a court may currently require a CPO respondent to vacate his residence[5] and we see no support for an interpretation of the catchall provision of D.C. Code § 16-1005 (c)(11) that circumvents those limitations.

---

[5] The dissent argues that this interpretation of D.C. Code § 16-1005 (c)(4) would permit a respondent to stalk a petitioner by moving into a residence in close proximity after CPO proceedings have begun. Dissent at 32 note 37. But such a scenario quite clearly can be prevented by a stay-away order issued under D.C. Code § 16-1005 (c)(2), or as part of a Temporary Protection Order (TPO), pending a ruling on the CPO petition, *see* D.C. Code § 16-1004.

In support of this interpretation of the Intrafamily Offenses Act, we note that the catchall provision appeared in the original version of the statute,[6] while the provision codified in D.C. Code § 16-1005 (c)(4) granting authority to order a respondent to vacate a residence—that of a petitioner—was added only later, in 1982, indicating that the preexisting catchall was not understood to give courts such authority. Indeed, in the Report discussing 1982 amendments, the Committee on the Judiciary observed that "several critical weaknesses in the District's current intrafamily offenses law have surfaced" and "existing remedies have been shown to be inadequate."[7] The proposed amendments were "designed to fill in . . . areas of need in the current District law," *inter alia*, by "supplementing existing remedies" and authorizing courts to "direct[] an offending householder or family member to vacate the dwelling unit."[8] Elsewhere the Report acknowledged that "[f]ive remedies, including a very broad one [referring to the catchall] already exist in the local law," but nonetheless characterized the power to issue a vacate order as

---

[6] D.C. Law No. 4-144.

[7] D.C. Council, Comm. on the Judiciary, Report on Bill 4-195 at 2 (May 12, 1982).

[8] *Id*. at 2-3; *see also id*. at 1 (identifying as "the purpose of this bill," the Council's aim to "expand the coverage and protections of the District's intrafamily offense law").

one of six "new statutory remedies available to the court issuing protection orders."[9]

By the same token, we note that with the addition of D.C. Code § 16-1005 (c)(4) the Council carefully delineated circumstances under which courts had the power to order a respondent to vacate a "dwelling unit." There would be little point in drafting the vacate provisions of (c)(4) with such precision if it were already understood that courts possessed broad power to issue vacate orders under the catchall provision of the statute. (And if this were the case, then (c)(4) would have been recognized as having a limiting effect—not the "expanding" effect ascribed by the Council.).

Lastly, we note that when the Intrafamily Offenses Act was amended again in 2007 and 2009, and the class of petitioners was expanded beyond the

---

[9] *Id*. at 10. Our dissenting colleague largely overlooks what the Council said. Quoting instead from one of this court's decisions discussing the 1982 amendments, our colleague asserts they did not confer any new authority on trial courts at all, but rather simply reaffirmed trial courts' preexisting broad authority under the catchall provision of that Intrafamily Offenses Statute. *See* Dissent at 39 note 53 (quoting *Cruz-Foster v. Foster*, 597 A.2d 927, 929 (D.C. 1991)). We question whether *Cruz-Foster* supports this proposition, but in any event we rely on the Council's actual statements.

"intrafamily" context to include victims of stalking, sexual assault, or sexual abuse generally,[10] there was no indication that the Council wished to empower courts to order the correspondingly expanded class of respondents to vacate their homes. As noted above D.C. Code § 16-1005 (c)(4) was not amended. Nor was there any indication that the Council believed an amendment was unnecessary and that courts already possessed broad power under the catchall provision to issue vacate orders. Against this backdrop of legislative silence, we determine that such power does not currently exist. If the Council desires that petitioners who have established by the low measure of good cause[11] that they were victims of stalking, sexual assault, or sexual abuse be able to obtain a one-year CPO not only directing the respondent to have no contact with them, but also forcing the respondent to vacate his or her separate pre-existing residence—because it is in the same

---

[10] D.C. Council, Comm. on the Judiciary, Report on Bill 16-247 at 7 (Apr. 28, 2006); D.C. Council, Comm. on Pub. Safety & the Judiciary, Report on Bill 17-55 at 7 (Nov. 25, 2008) [hereinafter Report on Bill 17-55].

[11] D.C. Code § 16-1005 (c) (a petitioner must show only "good cause to believe the respondent has committed or threatened to commit a criminal offense against the petitioner" in order to obtain a CPO). The Superior Court repeatedly noted its only object was to determine if Ms. Ramirez had met her burden of showing good cause to believe that Mr. Salvattera had committed a sexual assault.

apartment building, or on the same block, or in the same neighborhood as the petitioner's residence—then the Council will have to grant this power expressly.[12]

---

[12] Our dissenting colleague looks to D.C. Code § 16-1005 (c)(2) as independent authority for the vacate order. Dissent at 35-38. We hesitate to consider a statutory provision that neither Ms. Ramirez nor the Superior Court clearly relied upon to conclude that Mr. Salvattera has failed to show a likelihood of success on the merits of his claim such that he should be denied a stay pending appeal. But in any event we are unpersuaded.

We understand the argument to be that (c)(2) should be read as broadly as (c)(11), thereby giving courts authority to direct where a respondent may live as an integral part of a "stay away" directive. But we see no evidence of such broad authority in the statutory language, which instead authorizes the court to order the respondent to "stay away" or have "no contact" with the petitioner. There is an obvious difference between requiring someone to have "no contact with" an individual or to "stay away from" a location where he is not, and requiring someone to "vacate" a location where he already lives. As we explained above, *see* note 5, under (c)(2) a court could prohibit a CPO respondent from moving his residence in close proximity to a CPO petitioner. But (c)(2) by its plain language does not authorize a court to order a CPO respondent to vacate his pre-existing home. Nor do we find support for this interpretation of (c)(2) in its legislative history. What is now (c)(2) originally provided that a court could order a respondent to "avoid the presence of the family member endangered." The current language was adopted to make this prohibition more concrete and applicable outside the familial context, *see* Report on Bill 17-55 at 2; there is no indication that the Council desired to give courts broader authority to issue vacate orders.

Lastly, we note that the argument that the Superior Court in this case had to issue the vacate order to effectuate its stay away order presupposes that the 100-foot stay away order imposed was the court's only option. The statute does not require these terms and the record of this case demonstrates that the court had alternatives—for the six months that Ms. Ramirez's request for a CPO was being litigated, Mr. Salvattera was subject to and fully complied with a TPO to stay 15 feet away from Ms. Ramirez's person, home, and workplace. In short, a vacate order is not a necessary companion to (c)(2) because nothing in (c)(2) requires that

(continued…)

The gap we have identified in the statute is not filled by this court's general pronouncements that the Intrafamily Offenses Act must be interpreted broadly in light of its remedial purpose. We have made such statements exclusively in the context of intrafamily offenses, acknowledging the distinct dynamics of intimate partner violence.[13] These dynamics were very much on the mind of the Council at the time of the passage of the Intrafamily Offenses Act[14] and do not obviously transfer to crimes by mere acquaintances or strangers. In any event, we cannot interpret broadly that which is not there. Put another way, even accepting that

---

(…continued)
a stay away order be crafted so broadly that it renders a respondent like Mr. Salvattera homeless.

[13] In *Robinson v. Robinson*, we explained that "*the broad remedial purpose of the Intrafamily Offenses Act . . . is[] to protect victims of family abuse* from both acts and threats of violence." 886 A.2d 78, 86 (D.C. 2005) (emphasis added). We then observed that "[i]n furtherance of this broad purpose, the Act clearly envisions allowing safety concerns to trump property rights," and we acknowledged that "[a]lthough ordering a person to vacate his or her home or denying the use of owned property is a serious step, not to be lightly undertaken, when the trial court finds that *intra-family offenses* have been committed or are imminent, it can be a necessary measure to ensure peace and safety." *Id.* (emphasis added).

[14] The Council itself explained that the statute was "founded upon several premises: (1) family and home relationships are generally to be nurtured and protected by society; (2) actions by and between persons in a family or home type relationship can vacillate emotionally over a course of time; and (3) in the unfortunate event that abusive or harmful conduct surfaces among family or home members, criminal sanctions should not be the only avenue for correcting such abuses because problems of proof and threats to the long-term stability of the family or home may arise in the seeking of criminal sanctions." *Id.* at 8.

(c)(11) should be interpreted broadly in cases that fall both within and outside the intrafamily context, (c)(11) cannot give courts power in the latter context that they never had in the former.

As we acknowledged in *Robinson v. Robinson,* "ordering a person to vacate his or her home . . . is a serious step, not to be lightly undertaken." 886 A.2d 78, 86 (D.C. 2005). This is particularly true given that, in the civil protection order context, a petitioner's burden of proof is only good cause—far less than the burden of proof beyond a reasonable doubt required in criminal cases.[15] Although the Council has established and this court (in the context of discussing D.C. Code § 16-1005 (c)(4)) has recognized that this serious step "can be a necessary measure to ensure peace and safety" of petitioners in the context of intrafamily offenses, *Robinson*, 886 A.2d at 86,[16] the same cannot yet be said for the new class of

---

[15] To this court's knowledge, no criminal prosecution has been initiated against Mr. Salvattera.

[16] The dissent asserts that this court in *Robinson* "already has recognized that . . . an order may be issued under (c)(11)" directing a respondent to vacate his separate pre-existing home. Dissent at 41-42. We cannot agree. *Robinson* addressed whether a husband-respondent's property rights in a house in which he was not living at the time the CPO was issued, *see* 886 A.2d at 84 n.4, were given undue consideration by the trial court in fashioning the nature of the relief afforded to the wife-petitioner in that case. This court held that they were, and we remanded for the Superior Court to "re-evaluate the situation of the parties,

(continued…)

petitioners, general crime victims, who may now seek a CPO under the Intrafamily Offenses Act. A merits division of this court may ultimately reach a different conclusion, but for now, while Mr. Salvattera's appeal is pending and while the other provisions of the CPO are in force, we determine that Mr. Salvattera has at least shown a likelihood of success on the merits of his argument that the court exceeded its authority in ordering him to vacate his apartment.[17] Thus, a stay of the Superior Court's vacate order is warranted.

*So ordered.*

---

(…continued)
considering the entire mosaic of facts before it (including any developments since the entry of the last order), as well as the broad remedial measures available to safeguard Mrs. Robinson's safety and peace of mind." *Id*. at 87. But we never endorsed a vacate order as the necessary remedy, Dissent at 41-42, much less considered the trial court's authority to issue such an order under (c)(11) (we did not even cite to this provision). Indeed, we acknowledged the possibility that the trial court could adhere to its ruling on remand. *See* 886 A.2d at 87 n.8. Thus, to be clear, our ultimate point about *Robinson* is that it says nothing about (c)(11) and thus neither dictates nor informs our analysis in this case.

[17] *See Doe v. Axelrod*, 527 N.Y.S.2d 385, 390 (1988) (granting stay pending appeal and observing that where the case presents "novel issues of first impression . . . a preliminary injunction should be granted to hold the parties in *status quo* while the legal issues are determined in a deliberate and judicious manner" (cited with approval in *Akassy*, 891 A.2d at 310)).

GLICKMAN, *Associate Judge*, dissenting:  The stay order being entered in this case is quite alarming.  Its immediate result is that a victim of sexual violence and her children must flee their home out of fear for her safety, so that her abuser can stay in the neighboring apartment where he assaulted her.  Or, as appellant would have it, the terrorized victim in this case is free to remain in her apartment—a home she and her children cannot enter or leave without passing within a few feet of her assailant's door in an interior hallway out of public view—and go on living in fear that she may be attacked again.  Either way, contrary to precedent, the stay order rejects a well-established and effective remedial measure and prefers the abuser's property rights over his victim's safety.  The stay thus utterly vitiates the CPO that the Superior Court granted Ms. Ramirez.

This outcome is patently and tragically unjust.  It is the result of my colleagues' surprising embrace of appellant's radically restrictive interpretation of the Intrafamily Offenses Act.  His contention is not that the Act expressly prohibits the relief ordered in this case; there is nothing in the Act that does so.  Rather, appellant contends that, by authorizing the court in one provision to issue a CPO

directing a respondent to vacate *the petitioner's* dwelling unit,[1] the Council *implicitly* denied the court the power seemingly granted by other facially applicable provisions[2] to direct the respondent to cease residing near the petitioner—regardless of the need for such an order to protect the petitioner from the respondent's harassment or abuse. This narrowing interpretation of the CPO statute has potentially grave consequences not just in the present case, but in any CPO case in which the victim is unfortunate enough to dwell not with, but in close proximity to, his or her abuser.

My colleagues' cramped interpretation of the court's remedial powers under the CPO statute is irredeemably flawed because it is fatally at variance with both "the policy of the legislation as a whole"[3] and the plain language of the statute. As to the former, "the plain intent of the legislature was an expansive reading of the

---

[1] D.C. Code § 16-1005 (c)(4) (2012 Repl.) (providing that "[t]he judicial officer may issue a protection order that . . . [d]irects the respondent . . . to vacate[] the dwelling unit of the petitioner" when certain additional specified conditions also are met).

[2] D.C. Code §§ 16-1005 (c)(2), (c)(11).

[3] *A.R. v. F.C.*, 33 A.3d 403, 405 (D.C. 2011) (quoting *District of Columbia v. Beretta U.S.A. Corp.*, 940 A.2d 163, 171 (D.C. 2008)).

Act";[4] it "must be liberally construed in furtherance of its remedial purpose."[5] Accordingly, "we may not read into the Act limitations or restrictions which it does not contain."[6] These principles mean that if a remedy is within the scope of the relief authorized by the Act's remedial provisions broadly construed, and not clearly prohibited, it may be ordered so long as it is appropriate in the circumstances to keep the petitioner safe from the respondent.

Furthermore, my colleagues' acceptance of appellant's argument that D.C. Code § 16-1005 (c)(4) implicitly precludes the relief ordered in this case is premised on a mischaracterization of that provision. Contrary to their view of subsection (c)(4), it focuses solely on the need to remove an abusive respondent from "the dwelling unit of the petitioner"; it does not purport even to address, let alone prohibit, the court's authority to require an abusive respondent to move away from the petitioner's immediate vicinity. But the latter relief does fall squarely within the purview of two other subsections of D.C. Code § 16-1005 (c): the stay-away provision (c)(2) and the catchall provision (c)(11). Indeed, relying on the

---

[4] *Powell v. Powell*, 547 A.2d 973, 974 (D.C. 1988).

[5] *Araya v. Keleta*, 31 A.3d 78, 81 (D.C. 2011) (quoting *Cruz-Foster v. Foster*, 597 A.2d 927, 930 (D.C. 1991)).

[6] *Richardson v. Easterling*, 878 A.2d 1212, 1217 (D.C. 2005).

catchall provision, this court previously has upheld a petitioner's claim that the trial court has the statutory authority to order a respondent to vacate his own separate residence as "a necessary measure to ensure peace and safety,"[7] even though it was conceded that subsection (c)(4) did not authorize such an order.

Nothing in the statute or its legislative history justifies viewing subsection (c)(4) as an implicit limitation on the authority conveyed in (c)(2) and (c)(11). In my view, therefore, appellant has not shown any likelihood that his appeal will succeed on its merits, and we should deny his stay motion.

## I.

### A.

After an evidentiary hearing on Isela Ramirez's request for a CPO against Alfredo Salvattera, the trial court found the following facts.[8] Ms. Ramirez, who is

---

[7] *Robinson v. Robinson*, 886 A.2d 78, 86 (D.C. 2005).

[8] The court heard testimony from Ms. Ramirez and several other witnesses. Mr. Salvattera elected not to testify and, as the court observed, presented "no evidence to rebut" Ms. Ramirez's testimony. At the conclusion of the hearing, the court made detailed factual findings. Specifically crediting Ms. Ramirez's testimony in its entirety, the court found she had shown the requisite good cause to believe Mr. Salvattera had committed misdemeanor sexual abuse or contact against her. *See* D.C. Code §§ 16-1005 (c), 22-3006. In moving for a stay pending appeal,

(continued…)

from Mexico and does not speak English, lived in unit 302 of a small apartment building in Northwest Washington with her father and two small children. Alfredo Salvattera lived and continues to live in unit 102, two floors directly below Ms. Ramirez's apartment. Although his precise employment status was unclear, Mr. Salvattera acted in the capacity of a *de facto* building manager. On the evening of October 28, 2013, Ms. Ramirez went to Mr. Salvattera's apartment because he had sent her a text message asking to talk with her about the rent she owed. Ms. Ramirez was behind in her payments and concerned about being evicted. Mr. Salvattera let Ms. Ramirez in and offered her some sangria to drink. During their ensuing conversation, he asked her why she was unable to pay her rent and warned her that she could find herself out on the street at any time. He also showed Ms. Ramirez a photograph he had taken of her one day behind the building, without her knowledge.[9]

---

(…continued)

appellant does not challenge the fairness of the evidentiary hearing or claim that the court's findings and conclusions lack sufficient support in the record. *See Shewarega v. Yegzaw*, 947 A.2d 47, 52 (D.C. 2008); *Cruz-Foster*, 597 A.2d at 930 & n.3.

[9] On an earlier occasion, when Mr. Salvattera was in Ms. Ramirez's apartment to perform some work there, he told her he had dreamed about her in a red dress and wanted to "have" her.

As this meeting went on, Mr. Salvattera provided Ms. Ramirez a second and then a third glass of sangria. When she took a sip of the third glass, which she did not see Mr. Salvattera prepare, it tasted bitter. Within minutes, Ms. Ramirez developed a strong stomachache and felt sick. She asked Mr. Salvattera to help her, but he ignored the request. Ms. Ramirez vomited blood and passed out.

When she regained consciousness the next morning, she found herself lying in Mr. Salvattera's bed, naked from the waist down. Mr. Salvattera was standing beside the bed, fully clothed, holding the rest of her clothing. In confusion and distress, she began crying and yelling. She asked Mr. Salvattera why she was naked. He said they both had taken their clothes off, and that "what had to happen, happened." Ms. Ramirez denied having taken her clothes off and said she was going to the hospital and would call the police. Mr. Salvattera replied that he never did anything and told her to take her clothing and get out.

Ms. Ramirez fled the apartment. After speaking with her family and friends, who testified about her distraught demeanor as she recounted what had happened

to her,[10] she went to a neighborhood health clinic and then to the hospital. There she was examined by a sexual assault nurse and interviewed by the police, who collected her garments as evidence.[11]

Ms. Ramirez felt unsafe continuing to live in the same building as Mr. Salvattera. She became panicky and afraid whenever she encountered him, and she could not go in or out of the building without passing within a few steps of his apartment door. Her anxiety attacks worsened. Nonetheless, she continued to live in her apartment for the next few months because her father was still living there, and he could not be left there alone. Moreover, she had no place else to go. In January, however, her father moved out, and Ms. Ramirez and her children went to live in a shelter because she did not feel safe in the apartment without him there. (Later she moved in with a female friend, but, according to representations of counsel, this was only a temporary arrangement that she could not afford to maintain.) She eventually petitioned for a CPO so that she and her children could

---

[10]  Ms. Ramirez, who was asthmatic and had experienced panic and anxiety attacks prior to this incident, described herself as being horrified, fearful, panicked, confused, and short of breath.

[11]  At the time of the CPO hearing, no criminal charges had been filed against Mr. Salvattera.

return to her apartment and live there in safety. If she is unable to go back there, Ms. Ramirez fears she and her children will become homeless.

**B.**

When Ms. Ramirez filed her petition for a CPO on March 28, 2014, she requested that the court require Mr. Salvattera to vacate his apartment so that she would feel safe in her own home. Throughout the five months of proceedings that followed, Mr. Salvattera and his counsel were on notice of this request. Ms. Ramirez's counsel reiterated it at the evidentiary hearing. She contended that the court had the authority to order Mr. Salvattera to leave his apartment under the CPO statute's catchall provision, D.C. Code § 16-1005 (c)(11), and this court's decision in *Robinson* (a case I discuss below).[12] When the trial court subsequently rendered its findings and conclusions in favor of Ms. Ramirez on August 26, 2014, it again heard argument as to whether to require Mr. Salvattera to leave his apartment. Ultimately, the court found that the parties' circumstances and Ms. Ramirez's "paramount" safety concerns necessitated such relief. Accordingly, the court proceeded to enter a CPO requiring Mr. Salvattera to have no contact with

---

[12] *Robinson v. Robinson*, 886 A.2d 78 (D.C. 2005). I believe my colleagues are mistaken in suggesting, *ante* at 4, that Ms. Ramirez also cited D.C. Code § 16-1005 (c)(4) as direct support for her position.

Ms. Ramirez, to stay at least 100 feet away from her person, her home, and certain other protected locations, and to vacate his apartment.[13]

At no point in all this time did Mr. Salvattera argue that the court lacked the statutory authority to direct him to vacate his apartment, though he and his counsel obviously had multiple opportunities and every incentive to do so.[14]

The first time that Mr. Salvattera challenged the court's legal authority to grant such relief in a CPO was in a motion to alter or amend the court's judgment.[15] Although he offered no explanation for having failed to raise this challenge previously, the court decided to address it on the merits. In a written opinion, it rejected appellant's claim that the Intrafamily Offenses Act permits a court to order a respondent to vacate a dwelling unit only when the petitioner has a

---

[13] After considerable discussion as to how much time Mr. Salvattera needed, the court gave him until September 12, 2014, to move out. Appellant does not contend the court abused its discretion in setting this deadline.

[14] My colleagues implicitly chide the trial court for not initially identifying the statutory provision under which it ordered Mr. Salvattera to leave his apartment. *Ante* at 4. This seems unfair to the court, inasmuch as Mr. Salvattera had never disputed that the CPO statute's catchall provision furnished the necessary authority (as Ms. Ramirez expressly had argued).

[15] *See* Super. Ct. Civ. R. 59 (e).

statutorily-defined possessory interest in that unit as set forth in D.C. Code § 16-1005 (c)(4). To the contrary, after reviewing how we have interpreted the Act, the court held that its order was authorized by subsections (c)(11) and (c)(2):

> In this case, this Court's Order that Respondent vacate his apartment was a valid exercise of its authority under section 16-1005 (c)(11). Section 16-1005 (c)(11) empowers the Court to direct the respondent to perform or refrain from other actions as may be appropriate to the effective resolution of the matter. Here, the evidence at trial demonstrated that the layout of the apartment building would require Petitioner to pass by Respondent's apartment every time she enters or exits the building. The credible testimony of Petitioner also showed that Petitioner fears Respondent and feels deep anxiety due to the risk of encountering Respondent in the hallways and other common areas of the building. After considering the full range of available forms of relief, the Court determined, based on all of the evidence before it, that it would be appropriate to exercise its broad remedial power under the Act to fashion a remedy that will promote Petitioner's safety and peace of mind.

> Further, the Court's Order to Respondent to vacate the apartment was necessary to enforce the Civil Protection Order directing Respondent to stay at least 100 feet away from Petitioner's person, home, and vehicle and to have no contact with her. As noted above, due to the layout of the building, Petitioner must come within a few feet of Respondent's apartment each time she enters or exits the apartment building. As such, there is a substantial risk that Respondent will be unable to stay the required distance from Petitioner and to avoid having contact with her. To avoid frustrating the Civil Protection Order's stay-away provision, the Court determined that it would be appropriate to the resolution of this matter to direct

Respondent to vacate his apartment. For these reasons, the Court concludes that its August 26, 2014 Order was a valid exercise of its authority under D.C. Code § 16-1005 (c)(11), and that Respondent has not demonstrated a likelihood of success on the merits as to this issue.

## II.

The decisive question before us is whether appellant has shown he is likely to succeed on his claim that a trial court may not order a CPO respondent to leave his residence if the criteria of D.C. Code § 16-1005 (c)(4) are not met, "even where the trial court . . . determine[s] that such relief would be 'appropriate' to effectively resolve the matter before it."[16] The question is one of statutory construction, and we recently summarized the basic principles of that enterprise in another case involving the meaning of the Intrafamily Offenses Act, as follows:

> When interpreting a statute, the judicial task is to discern, and give effect to, the legislature's intent. The primary and general rule of statutory construction is that the intent of the lawmaker is to be found in the language that he has used. Individual words of a statute are to be read in the light of the statute taken as a whole, and where possible,

---

[16] *Powell v. Powell*, 547 A.2d 973, 974 (D.C. 1988).

courts should avoid constructions at variance with the policy of the legislation as a whole.[17]

The essence of appellant's argument is encapsulated in the Latin maxim *expressio unius est exclusio alterius*—"[a] canon of construction holding that to express or include one thing implies the exclusion of the other, or of the alternative."[18] As has often been said, this maxim is "an aid to construction of a statute rather than a rule of law."[19] We are careful to apply *expressio unius* "'with a considerable measure of caution,' and [to] ignore [the maxim] when the plain meaning of the statute and the intent of the legislature is clear from the expressed words in the statute."[20]

In my view, we must reject appellant's *expressio unius* construction of D.C. Code § 16-1005 (c)(4) because it conflicts with both the policy and the plain meaning of the statute.

---

[17]  *A.R. v. F.C.*, 33 A.3d 403, 405 (D.C. 2011) (internal quotation marks, brackets and citations omitted).

[18]  BLACK'S LAW DICTIONARY 701 (10th ed. 2014).

[19]  *Hubb v. State Farm Mut. Auto. Ins. Co.*, 85 A.3d 836, 843 (D.C. 2014).

[20]  *Id.* (quoting *Council of District of Columbia v. Clay*, 683 A.2d 1385, 1390 (D.C. 1996)).

**A.**

Before considering the relevant remedial provisions of D.C. Code § 16-1005 (c), it is imperative that we be clear about the policy of the Act and the spirit in which we are obliged to construe it. This is legislation "designed to counteract the abuse and exploitation" of vulnerable people, typically (but not exclusively) "women and children."[21] Over the past three decades, the Council has progressively amended the Act to broaden its coverage and ensure that it provides "truly effective remedies"[22] for those in need of them. The Act's protections now are equally available to victims of domestic violence and (as in the present case) to victims of "stalking, sexual assault, or sexual abuse" committed outside the domestic context.[23]

---

[21] *Cruz-Foster v. Foster*, 597 A.2d 927, 931 (D.C. 1991).

[22] D.C. Council, Comm. on the Judiciary, Report on Bill 4-195 at 10 (May 12, 1982).

[23] *See* D.C. Code § 16-1001 (12) ("'Petitioner' means any person who alleges, or for whom is alleged, that he or she is the victim of interpersonal, intimate partner, or intrafamily violence, stalking, sexual assault, or sexual abuse."); *A.R.*, 33 A.3d at 408 ("[T]here now are two types of petitioners who may seek a civil protection order: alleged victims of 'interpersonal, intimate partner, or intrafamily violence' and alleged victims of 'stalking, sexual assault, or sexual abuse.'").

Because "[t]he paramount consideration concerning this legislation is that it is remedial,"[24] and "the plain intent of the legislature was an expansive reading of the Act,"[25] we repeatedly have emphasized that the Act "should be liberally construed for the benefit of the class it is intended to protect."[26] We have emphasized as well that "[t]rial courts are granted broad discretion when implementing the remedial measures of the Intrafamily Offenses Act."[27] Accordingly, at least until now, we have rejected attempts by respondents to foist restrictive interpretations on the Act's protections.[28]

---

[24] *Cruz-Foster*, 597 A.2d at 929 (quoting *United States v. Harrison*, 461 F.2d 1209, 1210 (D.C. Cir. 1972)).

[25] *Powell v. Powell*, 547 A.2d 973, 974 (D.C. 1988) (reviewing legislative history of 1982 amendments).

[26] *Maldonado v. Maldonado*, 631 A.2d 40, 42 (D.C. 1993); *see also, e.g.*, *Cruz-Foster*, 597 A.2d at 931 (acknowledging "the Council's unambiguously stated preference for a generous construction of the remedial provisions of the Act").

[27] *Araya v. Keleta*, 31 A.3d 78, 81 n.5 (D.C. 2011).

[28] *See, e.g.*, *id.* at 80-81 (construing the term "marital property" in § 16-1005 (c)(4) liberally so as to "encompass[] the 'family dwelling unit,' regardless of technical ownership," and rejecting the respondent's alternative "mechanical interpretation" of the term based on divorce law as positing an "unduly narrow focus" of the Intrafamily Offenses Act, "which we have instructed trial courts to avoid"); *Robinson v. Robinson*, 886 A.2d 78, 86 (D.C. 2005) (holding that, because "safety concerns [can] trump property rights," the trial court can order the respondent to vacate a residence not shared with the petitioner when necessary "to ensure peace and safety").

Appellant has not disputed these principles or their applicability to the present case. However, my two colleagues on this panel appear to resist them when it comes to the Council's decision to extend the Act's protections to victims of stalking, sexual assault, and sexual abuse outside the context of domestic violence. Recognizing, as they must, what they call "this court's general pronouncements that the Intrafamily Offenses Act must be interpreted broadly in light of its remedial purpose," my colleagues dismissively say that "[w]e have made such statements exclusively in the context of intrafamily offenses, acknowledging the distinct dynamics of intimate partner violence. These dynamics … do not obviously transfer to crimes by mere acquaintances or strangers."[29]

To be frank, I do not profess to comprehend this rather cavalier belittlement of sexual violence against "mere acquaintances or strangers," or why my colleagues think the different "dynamics" might call for different and less generous principles of statutory interpretation. On the contrary, no principled basis exists to justify construing the remedies in the CPO statute more narrowly when it is applied outside the domestic violence context than when it is applied within it. The Council unquestionably was aware of our decisions holding that the Act is to be

---

[29] *Ante* at 11 (footnotes omitted).

"liberally construed for the benefit of the class it is intended to protect"[30]—a principle of construction fully in accord with the Council's own previously expressed desires—when it amended the Act to expand its coverage in 2007 and 2009. The Council said nothing on those occasions, either in the amendments or in the legislative history, suggesting any retreat whatsoever from that principle. The Council therefore must be understood to have endorsed our liberal construction of the available protections under the Act going forward, on behalf of *all* petitioners.[31]

---

[30] *Maldonado v. Maldonado*, 631 A.2d 40, 42 (D.C. 1993). The Council likewise would have been aware of our decisions in *Robinson*, *Powell*, and *Cruz-Foster*.

[31] *See Jackson v. United States*, 940 A.2d 981, 986-87 (D.C. 2008) (holding that the Council "implicitly endorsed our strict construction of the 'serious bodily injury' requirement in the aggravated assault statute" when it amended the statute "to create the intermediate offense of 'enhanced assault' rather than to change through legislation the high threshold of injury we have interpreted the aggravated assault statute to require"); *see also Lorillard v. Pons*, 434 U.S. 575, 580-81 (1978) ("Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change[]. So too, where, as here, Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law, at least insofar as it affects the new statute.") (internal citations omitted); *Faragher v. City of Boca Raton*, 524 U.S. 775, 804 n.4 (1998) (holding that when Congress amended Title VII of the Civil Rights Act of 1991 to expand the potential monetary liability of employers, it relied on and left intact the Supreme Court's statements in a prior case regarding limitations on employer liability).

For the sake of clarity, let me add that no one is arguing that the Council expanded the court's remedial options beyond those already provided in § 16-1005 (c) when it extended the Act's coverage to victims outside the "intrafamily" context.[32] But the Council did not wish to *curtail* the courts' options. It gave this new class of petitioners access to the same remedies as the Act makes available to the incumbent class of petitioners. And if it is supposed that an order requiring a respondent not to reside in close proximity to the petitioner would never be appropriate or necessary in the "intrafamily" context, that simply is not true. Indeed, as I shall discuss below, this court recognized the need for just such relief in an intrafamily case in *Robinson v. Robinson*.[33]

Thus, so long as an order requiring an abusive respondent to cease residing in the immediate vicinity of the petitioner is within the scope of the CPO statute's

---

[32] *Cf. ante* at 8-9.

[33] 886 A.2d 78 (D.C. 2005). *See also Zappaunbulso v. Zappaunbulso*, 842 A.2d 300 (N.J. Super. Ct. App. Div. 2004). In that case, the trial court was confronted with an abusive ex-husband who rented a house near his ex-wife in order to continue his vendetta against her after he was excluded from her home. "Considering defendant's pattern of stalking and harassment," the appellate court was "persuaded that the [trial court's] order barring him from residing in plaintiff's immediate neighborhood and ordering him to move out of his leased premises[] was authorized by [New Jersey's] Prevention of Domestic Violence Act and was necessary to effectuate the existing restraining order." *Id.* at 307-08. I shall have more to say about this case below.

remedial provisions, broadly construed, and is not prohibited by the clear language of the statute,[34] the trial court has discretion under the statute to grant such relief. "[W]e may not read into the Act limitations or restrictions which it does not contain."[35]

## B.

D.C. Code § 16-1005 (c) lists a number of remedial measures that may be included in a CPO to protect the petitioner from the respondent. The list is non-exclusive; we know this because it is followed by a catchall provision stating that the court may "[d]irect the respondent to perform or refrain from other actions as may be appropriate to the effective resolution of the matter."[36] Nonetheless, appellant contends that subsection (c)(4) *is* exclusive in the sense that it prohibits the court from requiring a respondent to vacate a dwelling unless its conditions are met. My colleagues are persuaded by this contention—they "understand D.C. Code § 16-1005 (c)(4) to define *all circumstances* under which a court may

---

[34] Appellant has expressly disavowed any claim that the order requiring him to leave his apartment was illegal for any reason other than his interpretation of the CPO statute.

[35] *Richardson v. Easterling*, 878 A.2d 1212, 1217 (D.C. 2005).

[36] D.C. Code § 16-1005 (c)(11).

currently require a CPO respondent to vacate *his* residence." *Ante* at 6 (emphasis added).[37]

That is *not* what (c)(4) says. By its express terms, the subsection addresses only one specific, commonly recurring problem in this area—the problem that arises when the respondent and the petitioner, abuser and victim, *are living together*. To deal with this one problem, the subsection provides that a CPO may:

> Direct[] the respondent to refrain from entering, or to vacate, *the dwelling unit of the petitioner* when the dwelling is:
>
> > (A) Marital property of the parties;
> >
> > (B) Jointly owned, leased, or rented and occupied by both parties; provided, that joint occupancy shall not be required if the respondent's actions caused the petitioner to relinquish occupancy;
> >
> > (C) Owned, leased, or rented by the petitioner individually; or

---

[37] The sweeping nature of this pronouncement should not be overlooked. It would seem to mean, for example, that a court would be powerless in a CPO proceeding to dislodge a stalker or sexual harasser who moved into the apartment next door to the petitioner in order to continue his malevolent activities against her, even if he did so after the CPO proceeding was begun. Similarly, my colleagues' conclusion suggests that a court would lack the authority to order a respondent to vacate a room in a student dormitory, residential hotel, or other group living situation, regardless of its proximity to his victim.

(D) Jointly owned, leased, or rented by the
petitioner and a person other than the respondent[.][38]

In making clear that a court has the authority to remove an abusive respondent

from *the petitioner's* home, subsection (c)(4) goes no further.  It does not purport

to address—let alone, to withhold—the power of the court to limit where else an

abusive respondent may reside.  In short, subsection (c)(4) neither authorizes nor

prohibits an order directing the respondent to vacate a dwelling unit other than that

of the petitioner; it does not speak to the matter.

The mere fact that (c)(4) does not affirmatively authorize such an order does

not mean the subsection necessarily precludes it.  "*Expressio unius* does not apply

'unless it is fair to suppose that [a legislature] considered the unnamed possibility

and meant to say no to it,' especially where the relevant legislative history reveals

no such intent.  More broadly, courts look for some evidence a legislature intended

application of *expressio unius*, lest it prevail as a rule of construction despite the

---

[38]  D.C. Code § 16-1005 (c)(4) (emphasis added).

reason for and the spirit of an enactment."[39]  There is no indication in either the language of (c)(4) or its legislative history that the Council ever considered or was confronted with the question presented here.  This, after all, is unsurprising, for while the need to order a respondent out of the petitioner's home arises frequently, the question of whether to order a respondent to stop living in a dwelling *near* the petitioner has arisen comparatively rarely.  And in amending the Act in 1982 to give trial courts more guidance as to the remedies they may provide CPO petitioners, the Council did not undertake to provide a detailed listing of every possible remedy for every conceivable scenario.[40]  The question therefore is whether *other* remedial provisions in D.C. Code § 16-1005 (c), liberally construed, *do* authorize the court to direct a respondent "to refrain from entering, or to vacate" his residence when it is appropriate to do so to protect the petitioner.  If so, then subsection (c)(4) does not stand in the way of granting that relief.

---

[39]  2A Sutherland Statutory Construction § 47:25 at 446 (7th ed. 2014) (quoting *Marx v. General Revenue Corp.*, 133 S. Ct. 1166, 1175 (2013); footnotes omitted).

[40]  *See Ali v. Federal Bureau of Prisons*, 552 U.S. 214, 221 (2008) ("We have no reason to demand that Congress write less economically and more repetitiously.").

There are, in fact, two such provisions. The first is subsection (c)(2). The second is subsection (c)(11).

Subsection (c)(2) is a complementary remedial provision to (c)(4). While the latter provision focuses only on the need to remove an abusive respondent from his victim's home, and removes any doubt as to the court's power to do so, (c)(2) more broadly authorizes the court to "require[] the respondent to *stay away from* or have no contact with the petitioner and any other protected persons or locations."[41] These words, "construed according to their ordinary sense and with the meaning commonly attributed to them,"[42] plainly encompass an order limiting how near the petitioner's home the respondent is permitted to reside.[43] Necessarily so, for were it otherwise, the respondent could frustrate the purpose of the stay-away directive and render it virtually worthless simply by choosing to live vexatiously near the petitioner. That is exactly the problem the trial court faced in the present case: If Mr. Salvattera is allowed to maintain his current living arrangements, the court

---

[41] D.C. Code § 16-1005 (c)(2) (emphasis added).

[42] *Peoples Drug Stores, Inc. v. District of Columbia*, 470 A.2d 751, 753 (D.C. 1983) (internal quotation marks omitted).

[43] My colleagues insist they "see no evidence of such broad authority in the statutory language" of (c)(2). *Ante* at 10 n.12. This seems to me like a denial of the obvious.

realized, its order requiring him to stay 100 feet away from Ms. Ramirez and her dwelling unit will be an exercise in futility.

This court has not heretofore had occasion to determine the scope of the stay-away provision of § 16-1005 (c). However, even before the 1982 amendments that added subsection (c)(4) to the CPO statute, the stay-away provision in the original Intrafamily Offenses Act was understood to permit the court to order the respondent to vacate his residence if necessary.[44] And as we consider the interplay between subsections (c)(2) and (c)(4), a New Jersey case, *Zappaunbulso v. Zappaunbulso*,[45] is quite instructive. In *Zappaunbulso*, the complainant's ex-husband had been barred from her home under a provision ("subsection (b)(2)") of New Jersey's Prevention of Domestic Violence Act authorizing the court to grant "exclusive possession" of the parties' residence to the plaintiff.[46] The ex-husband proceeded to rent and move into a house in the

---

[44] *See LaPrade v. LaPrade*, 108 Daily Wash. L. Rptr. 1773, 1779 (D.C. Super. Ct. Aug. 25, 1980) (stating that "[a]n order excluding the husband from the home would be well within the Court's discretion in an intrafamily offense proceeding pursuant to" its authority under the original Intrafamily Offenses Act to order the respondent to "avoid the presence" of the petitioner) (citing former D.C. Code § 16-1005 (c)(3) (1973)).

[45] 842 A.2d 300 (N.J. Super. Ct. App. Div. 2004).

[46] *See id.* at 302; N.J.S.A. § 2C:25-29 (b)(2).

complainant's immediate neighborhood so that he could continue to stalk and harass her. Because this house was not his ex-wife's dwelling, subsection (b)(2) did not apply to it. Nonetheless, observing that "[i]n construing the scope of the Act's protections, courts have looked beyond the four walls of a victim's residence,"[47] the Appellate Division held that the stay-away provision in the New Jersey Act empowered the court to order the abusive ex-husband to vacate the house he had rented.[48] Thus, the existence of a provision like our (c)(4) did not prevent the entry of such an order under a provision like our (c)(2).

We have not been cited to any contrary authority preventing a court from relying on the plain language of a stay-away provision such as D.C. Code § 16-1005 (c)(2) to order a respondent to move away from the immediate vicinity of the petitioner's home, and I am not aware of any. My colleagues say, in declining to interpret (c)(2) in accordance with its plain language, that they find no "support" for doing so in the legislative history. *Ante* at 10 n.12. But the silence of the legislative history cannot be a reason to reject the plain meaning and scope of the

---

[47] 842 A.2d at 306.

[48] *See id.* at 306-08; N.J.S.A. § 2C:25-29 (b)(6) (authorizing order "requiring the defendant to stay away from any specified place that is named in the order and is frequented regularly by the victim").

statutory text. As we have said, "a court should look beyond the ordinary meaning of the words of a statute only where there are 'persuasive reasons' for doing so."[49] A silent legislative record does not furnish such reasons.[50] And, of course, adherence to the principle that the CPO statute's remedial provisions must be construed expansively to benefit petitioners, per the Council's intentions, compels us to read the words of (c)(2) in accordance with their ordinary meaning, i.e., as authorizing the court to order a respondent to move away from the vicinity of the petitioner.

Subsection (c)(11) is the other pertinent provision in D.C. Code § 16-1005. It is, as the Council's Committee on the Judiciary stated in its report on the 1982 amendments, a "very broad" remedial provision in its own right.[51] As I have said above, (c)(11) allows the court to "[d]irect[] the respondent to perform or refrain from other actions as may be appropriate to the effective resolution of the matter." There is no question that an order directing a respondent to cease living in close

---

[49] *Peoples Drug Stores*, 470 A.2d at 755.

[50] *Id.* ("Where legislative materials are without probative value, or contradictory, or ambiguous, they should not be permitted to control the customary meaning of words.") (internal quotation marks and brackets omitted).

[51] D.C. Council, Comm. on the Judiciary, Report on Bill 4-195 at 10 n.* (May 12, 1982).

proximity to a petitioner whom he had abused or harassed would be "appropriate to the effective resolution of the matter" in some cases. Thus, the catchall provision by its terms encompasses the power to issue such an order. To construe it otherwise would, to quote this court's decision in *Powell*, "strain . . . the facial meaning of the provision."[52] Moreover, as this court declared in *Powell*, "an expansive reading . . . *must* be accorded to the catchall provision," just as it is to the Act as a whole.[53]

---

[52] *Powell v. Powell*, 547 A.2d 973, 974 (D.C. 1988).

[53] *Id.* (emphasis added). Appellant and my colleagues suggest otherwise. Because the catchall provision was in the original version of the Intrafamily Offenses Act, while the provision granting supposedly "new" authority to order a respondent to vacate the petitioner's residence was added later, they argue that the preexisting catchall was "understood" not to give courts such authority. *See ante* at 7-8 & n.9. But, as the Judiciary Committee's Report on Bill 4-195 states, this narrow view of the catchall was *not the Council's understanding* of the provision—and certainly not its understanding of how the provision should be understood going forward. Quite the opposite.

The problem the Council confronted in 1982 was that (in the absence of an authoritative construction from this court) some (not all) Superior Court judges reportedly had been interpreting the Act "too narrow[ly], so that 'truly effective remedies [were] not ordered in some cases.'" *Cruz-Foster v. Foster*, 597 A.2d 927, 929 (D.C. 1991) (quoting the Report on Bill 4-195); *but cf. LaPrade*, 108 Daily Wash. L. Rptr. at 1779. The Judiciary Committee's Report explains that in order to correct these "extremely narrow" interpretations and "meet the stated need . . . for the court to be guided more specifically as to what remedies can be afforded to the public," the Council amended the Act to make it clear that the court indeed had a broad range of remedial powers—all of them to be *augmented* by a "very broad" catchall provision, which the Council chose to retain. Report on Bill 4-195 at 10. The amendment thus was more an act of clarification than of

(continued…)

It is no answer to say that the Council did not specifically envision the issuance of orders to vacate under subsection (c)(11). The basic function of a catchall provision such as (c)(11) is to cover situations "not specifically contemplated" by the legislature;[54] the provision "act[s] as a safety net, offering appropriate equitable relief" for violations that the other subsections do not "adequately remedy."[55] Similarly, the fact that such "appropriate equitable relief" might be viewed as akin to the relief specifically authorized by one of the other

---

(…continued)

expansion—the added remedial powers were "new" mainly in the sense that they had not been mentioned specifically in the statute previously, but only had been implied; not in the sense that they were necessarily beyond the court's power under the pre-existing catchall provision (or, for that matter, the court's inherent equitable powers). Since the Council *criticized* the prior judicial interpretation of the Act's remedial powers as being unduly narrow, it cannot be inferred that the Council "understood" the catchall provision to be so incongruously constrained—especially when it said the very opposite.

For present purposes, though, the important point is not that the catchall provision necessarily had to be construed as authorizing an order to vacate *prior* to 1982 (though in fact it was construed thusly in *LaPrade*), but that *after* the 1982 amendments the catchall provision must be construed to do so, because the Council was dissatisfied with the earlier grudging construction accorded the remedial provisions in some cases, and because it retained the catchall provision to enlarge on the specific remedies it added. "[D]rafters of legislation … sometimes take a belt-and-suspenders approach in order 'to make assurance doubly sure.'" *Spectrum Health-Kent Cmty. Campus v. NLRB*, 647 F.3d 341, 346 (D.C. Cir. 2011) (quoting *United States v. Hansen*, 772 F.2d 940, 947 (D.C. Cir. 1985)). This was one of those times.

[54] *Republic of Iraq v. Beaty*, 556 U.S. 848, 860 (2009).

[55] *Varity Corp. v. Howe*, 516 U.S. 489, 512 (1996).

subsections (as appellant contends is so in this case) is *not* a reason to except it from the scope of the catchall provision. On the contrary, catchall provisions are exceptions to the norm that the specific controls the general. It is "a familiar canon of statutory construction that catchall clauses are to be read as bringing within a statute categories similar in type to those specifically enumerated."[56] So, for example, in *Powell* this court held that the catchall provision in (c)(11) authorizes monetary relief even though "several of the [specific remedial] provisions [in § 16-1005 (c)] [already] effectively deal with temporary adjustment of property interests, a form of monetary relief, and the litigation costs provision involves, of course, direct payment."[57] So, too, does (c)(11) authorize a court to order a respondent not to reside in the immediate vicinity of the petitioner, even as (c)(4) deals with excluding the respondent from residing inside the petitioner's dwelling.

In fact, this court already has recognized that such an order may be issued under (c)(11) even though it is not authorized by (c)(4). In *Robinson v. Robinson*,[58] the trial court granted a CPO requiring the respondent (Mr. Robinson)

---

[56] *Paroline v. United States*, 134 S. Ct. 1710, 1721 (2014) (internal quotation marks and brackets omitted).

[57] *Powell*, 547 A.2d at 974.

[58] 886 A.2d 78 (D.C. 2005).

to vacate the petitioner's (Mrs. Robinson's) home at 1224 Emerson Street; but the court refused to order him out of the house next door, at 1228 Emerson Street, because that house was "his property" and he had "a right" to live there.[59] On appeal, Mrs. Robinson correctly *conceded* that subsection (c)(4) did not authorize the court to order Mr. Robinson "to refrain from entering, or to vacate" 1228 Emerson Street, because "that provision applies only to the petitioner's 'dwelling.'"[60] Nonetheless, Mrs. Robinson argued, such relief was available under the catchall provision in § 16-1005 (c).[61] This court agreed with Mrs. Robinson: "Although," we stated, "ordering a person to vacate his or her home or denying the use of owned property is a serious step, not to be lightly undertaken, when the trial court finds that intra-family offenses have been committed or are imminent, it can be a necessary measure to ensure peace and safety."[62] Concerned that the trial court had placed undue "reliance on Mr. Robinson's property rights in allowing him, a known abuser, to live within twelve feet of his wife, his repeated victim," and that merely requiring him to vacate the marital home might be "inadequate," this court remanded the case for the trial court to re-evaluate the situation in light

---

[59] *Id.* at 87 n.7.

[60] Brief of Appellant at 20, *Robinson*, No. 04-FM-843. (The brief is available through this court's Clerk's Office.)

[61] *Id.* at 21-22.

[62] *Robinson*, 886 A.2d at 86.

of all the facts "as well as the broad remedial measures available to safeguard Mrs. Robinson's safety and peace of mind."[63]

My colleagues appear to suggest that *Robinson* is distinguishable from the present case because it arose in the context of domestic violence,[64] but that is an untenable distinction to draw in the wake of the 2009 amendment of the Intrafamily Offenses Act expanding the class of petitioners to include victims of stalking, sexual assault, or sexual abuse outside that context. As discussed above, the remedies provided in D.C. Code § 16-1005 (c) are equally available to all petitioners. If the Act authorizes a court to order an abusive ex-husband not to reside near the petitioner, as *Robinson* holds it does, then the Act authorizes a court to order the perpetrator of a sexual assault outside the domestic relations context not to reside near his victim. Appellant and my colleagues have identified no principled basis to distinguish the two cases as a matter of law. No principled basis exists. Although *Robinson* speaks in terms of intrafamily offenses, that is merely because it was decided before the Council expanded the coverage of the Act.

---

[63] *Id.* at 86-87.

[64] *See ante* at 11-13, & n.13.

My colleagues also assert that *Robinson* "neither dictates nor informs our analysis of (c)(11) in this case" because Mr. Robinson was not yet living in his property at 1228 Emerson Street at the time the CPO was issued, and therefore the court's authority to order him to "vacate" his residence was not the question before us on appeal. *Ante* at 12-13 n.16.[65] This assertion is erroneous in two respects. In the first place, in *Robinson* this court recognized that it needed to address the propriety of a vacatur order, and it expressly did so. This was because Mr. Robinson had moved in at 1228 Emerson Street after the trial court allowed him to live there. Hence the court specifically directed the trial court on remand to "re-evaluate the situation of the parties, *considering the entire mosaic of facts before it (including any developments since the entry of the last order)*, as well as the broad remedial measures available to safeguard Mrs. Robinson's safety and peace of mind."[66] This directive would have made no sense if the court's opinion had not made it clear that the authority existed to order Mr. Robinson to vacate 1228 Emerson Street.

---

[65] In the same footnote, the majority notes that *Robinson* did not cite to the catchall provision as the basis for any relief that might be ordered on remand. But it is clear that the *Robinson* court relied on the catchall, for the court was well aware that (c)(4) would not authorize an order requiring Mr. Robinson not to reside at 1228 Emerson Street, and that the appellant relied exclusively on (c)(11) to justify such an order.

[66] *Robinson*, 886 A.2d at 87 (emphasis added; citing *Maldonado v. Maldonado*, 631 A.2d 40, 43 (D.C. 1993)).

Secondly, and in any event, (c)(4) specifically addresses orders directing a respondent "to refrain from entering" as well as orders "to vacate" the petitioner's dwelling unit, and it draws no distinction between the two directives. Even if *Robinson* established only that (c)(11) authorized a "refrain from entering" order to a respondent with respect to his own residence, as my colleagues (mistakenly) imply, that would surely mean (c)(11) would authorize a "vacate" order to such a respondent as well. No reason appears why the catchall provision would cover one but not the other.

## III.

For the foregoing reasons, my colleagues err in concluding that appellant has a likelihood of prevailing on his argument that the Superior Court exceeded its authority under D.C. Code § 16-1005 (c) in ordering him to vacate his apartment. As I have shown, appellant's and my colleagues' parsimonious construction of the CPO statute is contrary to its plain words, the history and policy of the legislation, the Council's intentions, basic principles of statutory interpretation, and this court's precedents. It is tragically wrong in every respect that counts. In my view, appellant has not shown any likelihood that his appeal will succeed on its merits, and we should deny his stay motion.